[Civ. No. 40601. First Dist., Div. One. Apr. 27, 1978.]

NATHANIEL NEWMAN, Plaintiff and Appellant, v.
CITY OF OAKLAND RETIREMENT BOARD, POLICE AND FIRE
RETIREMENT SYSTEM, Defendant and Respondent.

452

COUNSEL

John C. Schaller for Plaintiff and Appellant.

David A. Self, City Attorney, and Jeffrey N. Haney, Deputy City Attorney, for Defendant and Respondent.

OPINION

LAZARUS, J.*—This appeal is by an Oakland police officer who, after sustaining a gunshot wound to his right wrist while on duty, was mandatorily retired for disability on February 1, 1974.

Two years later, the Oakland Police and Fire Retirement Board (hereinafter board) voted to reinstate him to active duty, thus terminating his right to receive his disability pension; this, although it was stipulated at the hearing before the board that there had been no improvement in the condition of his wrist, and that his impairment and the loss of the functional use of his right hand were still exactly the same as they had been at the time of the original award.

The board's action was based entirely on a change of policy in the Oakland Police Department with regard to the standards under which disabled policemen might be recalled for active duty. A so-called "full range of duties" standard was in effect at the time that he had been hired as a police officer and was still in effect when he was placed on disability retirement. Under its provisions, appellant could not have been called back to active duty unless he recovered to the extent that he could perform *all* of the regular duties of a police officer. The new standard, adopted after he had been retired, was known as the "reasonable range of duties" test. It abolished the old rule for recalling disabled pensioners and substituted a new criterion, namely, that a policeman who had been retired for disability might be compelled to return to active duty if he could perform a *reasonable range* of police duties, provided that there was an open position in the force to which he could be assigned. The board retroactively applied the change in policy to appellant's case as the basis for its decision to terminate his pension rights on the ground that his disability ceased to exist. Thereafter appellant commenced the present

---

*Assigned by the Chairperson of the Judicial Council.

proceeding in which he unsuccessfully sought a writ of mandate to annul the board's order in the court below; hence, this appeal was filed.

■ Appellant contends initially that the change in policy that came into effect after he had been mandatorily retired cannot be used retroactively to divest him of his right to his pension. We agree. This is because, as we will hereinafter attempt to make abundantly clear, he had already acquired a vested and fully matured contractual right to his pensionable status that could not be nullified merely because of subsequent changes in departmental policy. We are therefore obliged to conclude that the trial court's finding to the contrary was error.

We have also been urged by appellant to reverse this judgment on other grounds: that racial discrimination was involved in the process by which the board reached its determination that appellant's disability has ceased; that the trial court erred in admitting evidence as to the financial impact of appellant's retirement on the retirement fund; that it was error for the trial court to admit evidence as to appellant's present employment; that the trial court erroneously awarded damages to respondent in the amount of the undertaking that had been posted by appellant. We do not pass upon such additional contentions, however, since our holding that the board did not have the power to resort to a policy change with regard to "call-backs" as a basis for reinstating appellant to active duty, thereby depriving him of his vested pension rights, would appear to be dispositive here.

It is to this crucial issue that we therefore now turn. The record discloses that it arises from the following background:

Appellant was injured in the fall of 1972 when a bullet from a fellow officer's gun that was accidentally discharged penetrated his right (major) wrist. The two officers were at that time members of the police vice-control division, and were endeavoring to enter a building to serve a narcotics search warrant when the mishap occurred. Appellant had previously worked in various capacities on the Oakland police force for over five years.

The decision to retire appellant for disability was based upon medical evidence and the departmental policies then in effect. It was predicated on the unanimous finding of the members of respondent board that "it appears to this Board that the said Nathaniel Newman, is incapacitated for the performance of duty in the Police Department because of

Comminuted fracture, hamate bone, right (major) wrist and Traumatic arthritis with pain, stiffness, and loss of strength in the right hand and wrist received in or arising out of the performance of duty in the Oakland Police Department, and disability therefrom has continued without interruption for one year commencing January 30, 1973."

Accordingly appellant thereafter became entitled to disability payments based on 75 percent of the compensation for the rank he held when retired, to be adjusted periodically to include future salary increases for that rank. His disability pension in the beginning was $992.25 per month.

Thereafter, in November of 1975, the Oakland Police Department began to implement its change in policy concerning the assignment and retention of injured policemen. A call-back plan was put into effect as the initial step for the review of the status of retirees. Accordingly, appellant was notified to appear before the respondent board for hearings to determine whether he should be returned to active duty. Prior to the hearings appellant was examined by Dr. Jack Tupper, who had treated him for his injury, and Dr. Matthew Moles, as city physician, for evaluation of the present condition of his wrist. Each of the doctors found that there had been "no change in the patient's hand and wrist since his last examination in June, 1973" when he was first examined to determine whether he should be retired. Their medical reports were submitted to the board. At the hearing before the board there was also testimony that appellant was at that time working as a criminal investigator for the Santa Clara District Attorney's office and that the police department had jobs available with the same general duties that appellant was currently performing in Santa Clara County.

Thereafter the board made its finding that appellant was no longer incapacitated from performing the duties of an Oakland police officer. It also ordered that appellant's disability retirement allowance, which at that time amounted to $1,176.06 per month, cease no later than April 15, 1976, and that he be restored to police service in the rank occupied at the time of retirement.

Appellant thereupon filed his petition for mandamus and for a stay order in the trial court. The judge of that court issued an alternative writ of mandamus and the matter was set for a show cause hearing on the merits. The city physician, Dr. Moles, testified in that tribunal that, in his opinion, appellant could perform a reasonable range of police duties. The

trial court also heard testimony from appellant and his supervisor, Douglas Logan, that appellant was then employed as a criminal investigator with peace officer status in the Santa Clara County District Attorney's office. Other witnesses included Chief of Police George Hart and the commander of the personnel section, Lieutenant James K. Stewart, who described the reasonable range of duties concept, and who testified that positions were available with the Oakland Police Department which appellant could perform; Kenneth A. Maul, retirement systems manager for the City of Oakland; and Jackson Evans Morrison, president of the Police and Fire Retirement Board, who described the operation of the new call-back policy adopted by the board.[1]

Thereafter, in a memorandum of decision the trial court found that appellant did not acquire a vested right to a disability retirement based upon the duties required of him as of the date of his retirement. The court further found that appellant had not been discriminated against on the basis of his race and that the recall policy was primarily instituted to prevent unnecessary loss of services of trained personnel with cost savings as a secondary consideration. The judgment from which this appeal is taken ensued.

Appellant's first argument is that there could be no finding that his "disability has ceased" without some evidence that there had been some improvement in the physical impairment for which he was forced to retire on disability. The trial court agreed with respondent, however, that it is not the nature and extent of appellant's injury that governs, but his ability to perform any less demanding job that might be open for him in the police department. In other words, in their view, the standard to be applied in determining the retirement status of one who has already been placed on mandatory retirement, is the same as the one used to determine whether a sick or injured person who is still on the job is entitled to a disability leave. But, as we shall show, there is no analogy and hence this conclusion is based upon a faulty premise.

In fact, much of the confusion appears to result from the respondent's misreading of the Oakland City Charter, as well as its failure to recognize

---

[1]The new policy, called the "reasonable range of duties," was summarized as follows: "A member who sustains a disabling injury shall be returned to work in an assignment selected by the Chief of Police when the member's safety or the safety of others will not be seriously impaired and, in the opinion of the City Physician, he/she can perform a reasonable range of police duties without aggravating the injury. A disabled member will not be returned to duty unless there exists a regular position to which he/she can be assigned."

the real distinction between authorities in which a public employee has acquired an earned right to sick leave, a vacation, or retirement benefits while still on the payroll, and those in which the employee has already been pensioned for disability and whose employment has been terminated.

A literal reading of the provisions of section 2610(c) of the Oakland City Charter without resort to case law, would seem to make the legislative intent most clear. That section provides: "The Board may at any time order any member who has been retired for disability *to be examined by one or more physicians* appointed by the Board for that purpose, and *if it is found that the disability has ceased,* shall order that the retirement allowance shall cease and said member shall be restored to the service in the rank occupied at the time of retirement." (Italics added.)

If words are to be given their common meaning in the context in which they are used (Civ. Code, § 1644), what this plainly says is that in every case before a disabled public employee may be restored to active duty he must be examined by medical experts who must certify that the "disability has *ceased.*" But what "disability"? Logically, it could only refer to the physical disability for which the employee was retired in the first instance. ■ The charter provision that no public employee on disability retirement may be ordered back to work until there is a medical certification that the disability or impediment that originally caused his removal from the payroll no longer exists would seem to rule out any notion that he could nevertheless be recalled for active duty on some lighter job in the same department without the required certification. Any interpretation to the contrary would appear to ignore the well established principle that pension provisions must be liberally construed in favor of the pensioner. (*Terry* v. *City of Berkeley* (1953) 41 Cal.2d 698, 702 [263 P.2d 833]; *Gibson* v. *City of San Diego* (1945) 25 Cal.2d 930, 935 [156 P.2d 737]; *Lyons* v. *Hoover* (1953) 41 Cal.2d 145, 149 [258 P.2d 4]; *McKeag* v. *Board of Pension Commrs.* (1942) 21 Cal.2d 386, 390 [132 P.2d 198]; *Symington* v. *City of Albany* (1971) 5 Cal.3d 23, 33 [95 Cal.Rptr. 206, 485 P.2d 270].)

■ We must not overlook the qualifying rule, however, that the nature and extent of respondent's statutory obligation "must be ascertained not only from the language of the pension provisions but also from the judicial construction of this or similar legislation at the time the contractual relationship was established." (*Kern* v. *City of Long Beach*

(1947) 29 Cal.2d 848, 850 [179 P.2d 799].) We now therefore turn to the case law.

This dispute must be distinguished at the outset from sick pay cases and also from authorities involving the right to tenure or to remain in public employment in which the employee has earned some pension rights, but before his pension becomes payable. ■ This is because a public employee who serves under pension provisions of a statute or ordinance providing for pension payments to employees, who are retired for disability or who become eligible for retirement because of length of service, acquires a vested right to a pension that may not be constitutionally abolished after the happening of the contingency upon which the right to the pension commences. (See e.g., *Kern* v. *City of Long Beach, supra,* 29 Cal.2d at pp. 852-856; *Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 183-185 [265 P.2d 884]; *Miller* v. *State of California* (1977) 18 Cal.3d 808, 814-815 [135 Cal.Rptr. 386, 557 P.2d 970].)[2] The rationale of such cases is that a fully matured pension right is " 'an integral portion of contemplated compensation' " that "cannot be destroyed, once it has vested, without impairing a contractual obligation." (*Kern* v. *City of Long Beach, supra,* 29 Cal.2d at p. 853.) Such rights are " 'in the nature of compensation for the services previously rendered for which full and adequate compensation was not received at the time of the rendition of such services. They are in effect pay withheld to induce long-continued and faithful services.' " (*Id.,* at p. 852, quoting from *Giannettino* v. *McGoldrick* (1946) 295 N.Y. 208 [66 N.E.2d 57, 59].)

As stated in a more recent authority: "It is well settled that retirement benefit rights—including pensions whether for age and service, disability or death—are vested (*Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 45 [112 Cal.Rptr. 805, 520 P.2d 29]; *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 853 . . .; *Dryden* v. *Board of Pension Commrs.* (1936) 6 Cal.2d 575, 579 . . .; *O'Dea* v. *Cook* (1917) 176 Cal. 659, 661-662. . . . ■ Pension rights of police officers provided by city charters are considered part of their compensation, serve as incentives toward public service, and vest at the time of their employment. 'It has been clearly held that the pension provisions of the city charter are an

---

[2]As pointedly stated in a leading text: "[T]he modern California rule is that pension rights vest absolutely upon the happening of the event which is determinative of a public employee's pensionable status" (Annot., 52 A.L.R.2d 437, 445, fn. 7), and that "The California courts have held that no detrimental modification of a pension plan is permissible as to a public employee who has fulfilled all of the requirements of the plan, his status being fixed upon the happening of the contingency which makes the pension due and payable." (*Id.,* at p. 448.)

integral portion of the contemplated compensation set forth in the contract of employment between the city and a member of the police department, and are an indispensable part of that contract, and that the right to a pension becomes a vested one upon acceptance of employment by an applicant.' (*Dryden* v. *Board of Pension Commrs., supra,* 6 Cal.2d 575, 579 [59 P.2d 104].)" (*Dickey* v. *Retirement Board* (1976) 16 Cal.3d 745, 748-749 [129 Cal.Rptr. 289, 548 P.2d 689]; see also *Miller* v. *State of California, supra,* 18 Cal.3d 808.)

■ However, "Although vested prior to the time when the obligation to pay matures, pension rights are not immutable. For example, the government entity providing the pension may make reasonable modifications and changes in the pension system. This flexibility is necessary 'to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy.' (*Kern* v. *City of Long Beach, supra,* 29 Cal.2d 848, 854-855; see also *Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 183 . . .; *Packer* v. *Board of Retirement* (1950) 35 Cal.2d 212, 214 . . . .) In *Wallace,* referring to *Kern,* we again emphasized 'that a public pension system is subject to the implied qualification that the governing body may make reasonable modifications and changes *before the pension becomes payable* and that until that time the employee does not have a right to any fixed or definite benefits but only to a substantial or reasonable pension.' (42 Cal.2d at p. 183.)" (*Miller* v. *State of California, supra,* 18 Cal.3d at p. 816; italics added.)[3]

The permissible scope of modification of vested pension rights that have not fully matured need not be considered here since the change with which we are concerned undeniably took place long after appellant was forced to retire.

Thus the trial court was clearly mistaken here in likening a disability pension to sick pay in its memorandum of decision. True, both are benefits that one receives when he is physically incapacitated for work,

---

[3]Miller was an assistant inheritance tax attorney employed by the State Controller. The mandatory retirement age for state employees was age 70 when Miller was first employed. It was later reduced to age 67. In his mandamus proceeding he contended that he could only be compulsorily retired at age 70 and not when he reached age 67. The Supreme Court disagreed, holding that he had no constitutionally protected right to remain in employment until he had earned a larger pension at age 70.

but the analogy ends there. In the absence of special provisions, as the trial court itself recognized, there is never a vested right to sick pay.[4]

Respondent looks largely to authorities such as *Barber* v. *Retirement Board* (1971) 18 Cal.App.3d 273 [95 Cal.Rptr. 657], and *Craver* v. *City of Los Angeles* (1974) 42 Cal.App.3d 76 [117 Cal.Rptr. 534], for support. But these were cases in which the statutory criterion for disability retirement was the phrase "incapacity for performance of duty" usually found in city charters, not the "full range of duties" standard in effect when appellant was involuntarily retired. They are therefore inapposite for this and other reasons.

In *Barber,* a fireman who had lost a leg while on active duty as a hoseman sought review of a judgment denying his petition for a writ of mandate directing the retirement board to vacate a directive compelling him to retire pursuant to certain charter provisions. In other words, Barber was seeking to avoid retirement, not to protect a pensionable status that had existed for some time. Consistent with the rule that pension statutes should be liberally construed in favor of the employee, the Court of Appeal affirmed on "the well recognized public policy favoring the employment and utilization of physically handicapped persons" *(id.,* at p. 278), there being permanent light duty jobs to which Barber could be assigned.

*Craver* involved a Los Angeles policeman who sought a disability retirement pension due to a back injury sustained in the line of duty. He appealed from the lower court's denial of his petition for a writ of mandate. Thus, unlike appellant here, Craver had *never been placed on disability retirement.* The appellate court reversed the judgment and, as a guide for determination of the issues to be settled on remand, pointed out that under the charter provision applicable there the policeman would not be entitled to a disability retirement pension if he could perform duties in a given permanent assignment within the police department. Specifically, the court stated: "We agree with the court in *Barber* v. *Retirement Board, supra,* 18 Cal.App.3d at page 278, that where there are permanent light duty assignments and a person who becomes 'incapaci-

---

[4]The memorandum of decision did note that there is a vested right to an earned pension (one to which the recipient becomes entitled because of length of service), citing *Terry* v. *Berkeley, supra,* 41 Cal.2d 698, and *Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128 [287 P.2d 765]. What the trial court apparently overlooked, however, is that *Terry* is a disability pension case, not an *earned* pension case. In fact, *Terry* is similar to this case, holding that a change in the method of computing retirement benefits could not be retroactively applied to a pensioner who had already been retired for disability.

tated for the performance of his duty . . . shall be retired,' that person should not be retired if he can perform duties in a given permanent assignment within the department." (42 Cal.App.3d at pp. 79-80.)

It is upon a Washington State case decided some 40 years ago (cited as authority by the Court of Appeal in *Brooks* v. *Pension Board* (1938) 30 Cal.App.2d 118 [85 P.2d 956]), that respondent leans most heavily. According to respondent's brief, that decision, *Clark* v. *Board of Police Pension Fund Com'rs* (1937) 189 Wash. 555 [66 P.2d 307] "presents a factual situation so similar to petitioner Newman's that it must be considered 'on all fours' with it." It involved a motorcycle officer whose right leg was shortened following a fracture of the femur in a duty-related accident. About five years after his injury he was brought before the pension fund board for a hearing to determine if his disability had ceased. Medical evidence indicated that he still was unable to walk without pain, but for some time had had no difficulty in working as an automobile salesman. It also appeared that in the meantime the police department had abandoned the use of motorcycles, and had replaced them with prowler cars. The pension fund board therefore found that his disability had ceased since "[t]here are at least eleven or twelve jobs in the department the duties of which he is capable of performing; in fact, under the present conditions obtaining in the department, he is capable of performing the same duties that devolved upon him at the time he was injured." (*Id.,* at p. 308.)

Thus, while it might appear from a superficial examination that the facts in *Clark* were somewhat similar, a more critical analysis indicates that the distinctions are more obvious than any resemblance. We mention only the following:

The crucial difference between *Clark* and the present case is that in *Clark* there were no requirements that a police officer had to be capable of performing a "full range of duties" before his pension could be terminated and he could be restored to active duty. With no policy guidelines, both the board and the court had much greater freedom in establishing standards.

Next, motorcycles had been completely replaced by prowler cars for patrol work in *Clark*. Thus, Clark was able to perform exactly the same kind of job functions that he did before. Newman could not. The Oakland Police Department had not made changes in the available jobs after Newman retired. In fact, Newman asked to remain in the

department and to be assigned to lighter duties. This request was denied at the time that he was forced to retire because of the then firm policy requiring all officers to be able to perform a "full range of duties." The board's action then, however, was consistent with the law of this state as determined in *O'Neal* v. *City etc. of San Francisco* (1969) 272 Cal.App.2d 869 [77 Cal.Rptr. 855].

Finally, it has been stipulated here that there was absolutely no change or improvement in Newman's physical condition. Clark, on the other hand, had improved to the extent that it was reasonable to consider whether he could, because of the abandonment of motorcycles for patrol work, perform substantially the same duties and functions that he did before.

It is therefore clear from the authorities heretofore cited that there could be no statutory modification or detrimental change in appellant's pension rights after he had already been forced to retire for disability. But the change here was not in the language of a statute or charter provision, but the retroactive application of a new policy that was nonexistent at the time that appellant was pensioned.

We find no case in California in which a court has directly passed upon the specific question as to whether the same rule would apply to a policy change which was an integral part of the contract of employment that would be applicable to a statutory change. But policy is often, as in this case, a mere extension of the operative provisions of a statute.

Civil Code section 1655 provides: "Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention."

Civil Code section 1656 provides: "All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded."

The "full range of duties" policy was in effect both at the time that appellant was first hired as a police officer as well as the time that he was forced to retire. It was this long established policy, and not some nonexistent policy, that was intended to and did become a part of

appellant's pension contract. Appellant had the right to rely upon what had always been the standard practice of the police department, and upon retirement, arrange his life accordingly. It can hardly be said that the adoption of the subsequent policy, if applicable to appellant, was a mere change in administrative policy that did not modify his pension rights. The change in policy here is one that either entitles a disabled employee to a pension or takes it away. Though the department acknowledges that it would have been possible for Newman to remain on the job as a policeman performing lighter duties, it refused to permit him to do so at the time of his retirement because of the firm policy of requiring all officers to be able to perform a "full range of duties." To permit a change of mind upon the part of the department heads at this late date would appear to be a rank injustice.

As stated in *Terry* v. *City of Berkeley, supra,* 41 Cal.2d at page 703: "In the present case the plaintiff had been retired; he had rendered the called-for performance; he had done everything possible to entitle him to the payment of his pension and all conditions precedent to the obligation of the city were fulfilled upon the determination that he be retired as a result of his service-connected disability."

Respondent's attempt to distinguish *Terry* and similar decisions on the ground that they involved charter changes only affecting the amount to be paid to the pensioner is futile. This is a much stronger case because here respondent seeks to totally divest appellant of his pension.

For the foregoing reasons we conclude that the "reasonable range of duties" policy adopted after appellant had been involuntarily retired could not be applied retroactively to deprive him of his already accrued retirement benefits.

The judgment is reversed and the case is remanded to the trial court with directions to issue a writ of mandate commanding respondent to restore to appellant his pensionable status and to pay all pension benefits that have accrued since they were terminated.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied May 19, 1978.