[Civ. No. 16629. Fourth Dist., Div. One. Jan. 31, 1979.]

DANIEL ROCCAFORTE, JR., Plaintiff and Appellant, v.
CITY OF SAN DIEGO et al., Defendants and Respondents.

**COUNSEL**

Lewis & Marenstein and Patrick J. Thistle for Plaintiff and Appellant.

John W. Witt, City Attorney, and Thomas F. Calverley, Deputy City Attorney, for Defendants and Respondents.

## OPINION

STANIFORTH, J.—Police Officer Daniel Roccaforte, Jr. (Roccaforte) was injured while making an arrest. His employer, the City of San Diego (City), first accepted responsibility and paid Roccaforte full pay injury leave benefits until April 1, 1977. The City then terminated the injury leave pay and thereafter denied disability retirement pay and at the same time refused to reinstate him to his duties as a police officer.

Roccaforte sought a writ of mandate to overturn these decisions made by three separate agencies or departments of the City. Roccaforte questioned these specific decisions: (1) the termination of injury leave pay by Rick Cumming III, Safety Officer, City of San Diego; (2) the denial of industrial disability retirement by the Retirement Board of Administration, City of San Diego (Retirement Board), and (3) the refusal by William Kolender, Chief of Police, San Diego, to reinstate Roccaforte to active duty as a police officer. The trial court viewed these actions separately and found (1) the termination of injury leave pay was supported by medical evidence and that Roccaforte had failed to exhaust his administrative remedies, (2) the denial of industrial disability retirement was supported by medical evidence, and (3) the reinstatement of Roccaforte to active duty as a policeman was premature and thereupon denied his petition for writ of mandate. Roccaforte appeals.

### FACTS

Roccaforte was a police officer employed by the City on November 21, 1975, when in the course of his duties he was injured while attempting to make an arrest of a violent person. Roccaforte forthwith was taken to the hospital, received medical diagnosis and treated for the resultant injuries. He remained off work until January 4, 1976, and the City provided medical treatment and paid compensation in the form of injury leave pay until Roccaforte returned to active duty in January 1976.

On March 13, 1976, Roccaforte was examined by Dr. Paul Leonard referable to his injuries. Dr. Leonard reported: "[Roccaforte] was involved in an altercation on that date suffering injuries to the neck, back,

and right hand. He was off work about 6 weeks and under treatment of Dr. Whaalen. He was treated for a crush injury to the right midfinger, as well as neck and back injury. He had receive[d] a blow to the head when he fell hitting the right frontal area on cement. He had a large area of swelling but he was not unconscious. He is back at work and continues to have the following complaints:

"1. Pain of the right midfinger involving the mid and distal joints. Pain is precipitated by cold and damp weather, or any effort at strenuous gripping or squezzing [sic];

"2. Neck pain, primarily at the base of the neck and moving upward. He develops occipital orbital headaches which are quite severe on an occasional basis. Neck pain is not constantly present but occurs at least 3 to 4 times/week. It seems to be precipitated by nervous tension. He finds that he has discomfort especially at night which interferes with his capacity to sleep because of the pain. He denies difficulty with recall, difficulty with concentration, spots in front of the eyes, ringing of the ears, personality change, loss of sense of taste or smell, or other symptomatology of post-traumatic head syndrome.

"The patient also complains of back pain precipitated by prolonged driving, lifting over 20 to 25 pounds. Pain will radiate from the waist down to the tailbone but does not go into the hips or legs. Pain is present only with these activities described above. He states he used to lift weight[s] and was in fairly good shape capable of handling fairly heavy lifting without difficulty, but now cannot do any workouts because they markedly accentuate his pain." And the doctor concludes:

"This man has residuals of chronic cervical and lumbar strain and sprain, as well as crush injury to the right midfinger. There is loss of grip in the right major hand, pain of the low back which interferes with his capacity to do more than light lifting on a repetitive basis. There is no evidence of neurologic deficit in either the upper or lower extremities.

"His condition appears to be stationary and ratable, for all practical purposes based on the above objective findings." And the doctor adds this enigmatic opinion:

"He may continue working as a peace officer without specific restrictions, but could not do more than light lifting on a repetitive basis."

Roccaforte continued to receive medical care and continued at work through March 31 when he absented himself, on the advice of Dr. Haaland, his treating physician, due to the medical problems related to his injuries. He applied for and was granted further injury leave pay for a period during the month of April 1976.

On April 23, 1976, Rick Cumming III wrote Roccaforte: "It is my unfortunate duty to inform you that injury leave benefits for the above injury must cease effective on the date indicated above.

"Your injury leave benefits are being terminated because your doctor has indicated that your condition has become permanent and stationary. The rules governing the injury leave program specify that these benefits must cease when we are so notified.

"In the meantime, you are still eligible for Workmen's Compensation benefits and you may use your accumulated sick leave for your absences. If you have no sick leave then you will receive temporary disability payments.

"I sincerely hope that you are recuperating well."

Thereafter on May 21, 1976, Roccaforte's physician Dr. Haaland reported to the City that because of Roccaforte's persistent discomfort related to the November 1975 injury, he elected to declare Roccaforte temporarily disabled for "six to eight weeks." The City, however, refused and continued to refuse to pay injury leave to Roccaforte.

Concurrent with the City's termination of injury leave benefits, another agency of the City refused to reinstate Roccaforte to his job as a policeman. By letter of April 25, 1976, Roccaforte was advised by the representative of the San Diego Police Department, personnel section, that the work restrictions contained in Dr. Leonard's report of March 17 precluded his return to work at the police department.

On June 16 Roccaforte filed an application for a service-connected disability pension pursuant to the San Diego City Employees Retirement System's Rules. At the request of the Retirement Board (the body charged with determining Roccaforte's claim to disability pension) Roccaforte was examined by Dr. F. Bruce Kimball who by report dated July 7, 1976, concluded:

"Therefore I do not think he is permanently incapacitated for the performance of his duties, but I think he is temporarily totally incapacitated at this time for any of the duties listed in the attached job descriptions.

"As to treatment I would recommend that he be placed under the care of some orthopedist and given maximum benefit of all types of treatment that may be available, even including hospitalization, traction, and physical therapy, and immobilizing devices if indicated. After another six months he may then be reassessed. It is hoped that he would recover in that period of time."

In early September 1976, Roccaforte received a further letter from the personnel section of the San Diego Police Department stating that medical reports in their possession showed Roccaforte did not meet the medical requirements for the position of a police officer. The letter further related that Roccaforte "had certain options available to him and that 'it is mandatory that one of these options be completed within forty-five (45) days from the receipt of the letter.' "[1]

The Retirement Board, on September 17, 1976, considered Roccaforte's application for a service-connected disability retirement at an informal hearing and examined the reports of Drs. Leonard, Haaland and Kimball. No further testimony was taken and Roccaforte's application was denied. Roccaforte promptly requested a formal hearing before the Retirement Board.

On September 22, 1976, Roccaforte was examined by Dr. McDade at the request of the workers' compensation section of the City. Dr. McDade made but one examination of Mr. Roccaforte but prepared two reports which were made part of the record in the formal hearing before the Retirement Board. The first report (Nov. 18, 1976) was comprehensive by nature. Dr. McDade described Roccaforte's history, complaints, symptoms and concluded that Roccaforte's medical condition was "permanent and stationary." Dr. McDade further concluded he could "See no reason why Mr. Roccaforte could not return to his usual work

---

[1] These options were:

"1. Provide competent medical evidence indicating that Petitioner is physically qualified for his position,

"2. Request transfer to a job classification for which Petitioner is physically and vocationally qualified to perform,

"3. Initiate and complete retirement proceedings, and

"4. Resign his position as a Police Officer."

activity as a police officer in an unrestricted capacity." Dr. McDade's second report, *again based upon the single examination* of Roccaforte, stated his examination had not been completed and "in all fairness to both sides, his hand and finger should be examined in some detail prior to completing my orthopedic evaluation for you." No further evaluation was in fact conducted by Dr. McDade.

At the formal hearing before the Retirement Board (Dec. 1, 1976) the various doctors' reports recited above were received and considered. Roccaforte testified concerning his injuries and treatment. He related his present condition of severe pains in the upper and lower back, severe headaches, pain in right hand, loss of strength in the right hand, loss of sensation in the middle and ring finger of the right hand. He further explained Dr. McDade's failure to make a further examination. He testified that Dr. McDade had not requested him to return to the office nor did Dr. McDade phone or communicate with him by mail since the first examination.

Sergeant Thomas Blackledge of the San Diego Police Department testified the restrictions contained in Dr. Leonard's report of March 1975 would preclude the injured officer from returning to work for the City. He stated the qualifications for a police officer included the ability to engage in fights if the need arises, to make arrests, to handle calls for service to perform a range of activities from quieting a barking dog to carrying a body out of the canyon. His opinion was based upon Roccaforte's testimony, as well as the medical documentation in his file, it was not proper for Roccaforte to return to work as a police officer.

After this formal hearing the Retirement Board denied Roccaforte's request declaring:

"1. The applicant's injury or disease is not known as substantiated by Exhibits 1 through 8 and the oral testimony of Mr. Roccaforte.

"2. The applicant is not currently incapacitated as substantiated by reports of Dr. F. Bruce Kimball dated 7/7/76 and Dr. William C. McDade dated 11/18/76.

"3. The applicant is not permanently incapacitated from the performance of duty as a result of the above injury or disease as substantiated by the medical reports in #2 above.

"4. The injury or disease was not due to intemperance, willful misconduct, or violation of law by the applicant as substantiated by the Department Head Remarks in Exhibit C."

Roccaforte, in response to the findings (2 and 3 above) of the Retirement Board, presented himself to the personnel officer of the San Diego Police Department and requested to be returned to work. This request was denied on December 6, 1976. The chief of police wrote: "At the present time Daniel Roccaforte does not meet the physical qualifications for the position of police officer." Thus Roccaforte found himself in this administrative crossfire: one office of the City refuses to pay him injury leave pay on the grounds that medical evidence indicates his position was permanent and stationary. A second administrative arm of the City, the Retirement Board, denied him disability retirement benefits since he is not currently "incapacitated." A third face of the City, the police department, refused him reemployment as a police officer for he does not meet "the physical qualifications." From the vortex of this administrative quagmire Roccaforte petitioned for writ of mandate.

Both parties raised the issue of the standard of judicial review of the administrative determination in their pleadings and in their authorities before the trial court. The *Strumsky* standard (*Strumsky* v. *San Diego County Employees Retirement Assn.,* 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29]) was brought to the court's attention. However, the focus of the discussion before the trial court was whether *substantial evidence* upheld the various administrative findings. The trial court in its summation and oral statement of decision found *no abuse of discretion* in terminating the injury leave pay—based upon Dr. Leonard's report. The trial court further found that Roccaforte had not appealed from that decision as required by section 4, subdivisions (c) and (d), of the personnel manual section 37.63.

Concerning the Retirement Board's action, the court said: "The Board's decision is supported by ample evidence . . . ." A few moments later, however, the court said: "[T]he court, after reading all of those reports and exercising its independent opinion, is of the opinion that the Board properly found that there was not a permanent incapacity justifying an industrial retirement." It is not clear from a reading of the court's decision as to what standard of review was applied to the Retirement Board determinations. It is clear that the substantial evidence test was applied to the City's decision to terminate injury leave pay. We do not know what standard the judge applied to support the decision by

the police department. The best that can be gleaned in totality is that there is an ambiguity as to what standard of review was applied by the court.

## DISCUSSION

█ The independent judgment standard of review is required wherever an administrative decision substantially affects fundamental and vested rights. (*Strumsky, supra,* at p. 34; *Bixby* v. *Pierno,* 4 Cal.3d 131, 144 [93 Cal.Rptr. 234, 481 P.2d 242]; *Merrill* v. *Department of Motor Vehicles,* 71 Cal.2d 907, 914, 915 [80 Cal.Rptr. 89, 458 P.2d 33].) The term "vested" is defined in *Harlow* v. *Carleson,* 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698], where it was stated: "The term 'vested' has been used in a nontechnical sense to denote generally a right 'already possessed' [citation] or 'legitimately acquired.' [Citation.] On this basis, this court has distinguished generally between applicants and recipients in determining whether a right is 'vested' for the limited purpose of determining the applicable scope of review."

And in *Bixby* v. *Pierno, supra,* 4 Cal.3d 131, 144-145: "In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation. This approach finds its application in such an instance as the opportunity to continue the practice of one's trade or profession . . . ."

In *Dickey* v. *Retirement Board,* 16 Cal.3d 745 [129 Cal.Rptr. 289, 548 P.2d 689], the Supreme Court considered this fundamental vested right question where Dickey requested payment of "full pay disability benefits" based upon an injury he had received in the course of his duty as a police officer. The right claimed by Dickey although called by a different name is similar to that claimed by Roccaforte. The Supreme Court said at pages 748-749:

"We consider first whether the right is vested. It is well settled that retirement benefit rights—including pensions whether for age and service, disability or death—are vested [citations]. In *Strumsky* we held such a right to be vested so as to require application of the independent judgment standard in reviewing the administrative decision of a local agency. Pension rights of police officers provided by city charters are considered part of their compensation, serve as incentives toward public service, and vest at the time of their employment. 'It has been clearly held

that the pension provisions of the city charter are an integral portion of the contemplated compensation set forth in the contract of employment between the city and a member of the police department, and are an indispensable part of that contract, and that the right to a pension becomes a vested one upon acceptance of employment by an applicant.' [Citation.]

"We can perceive no significant difference in this respect between provisions for pensions on retirement for disability and provisions for full salary payments for disability during active career employment. Each would appear to be a part of the contemplated compensation to police officers that would vest upon the acceptance of employment. The Board contends, however, that plaintiffs' rights to full salary disability benefits do not vest until all the contingencies have occurred, that is, until the police officer is incapacitated for the performance of his duties and such incapacity is determined to be the result of 'bodily injury received in or illness caused by the performance of his duty.' It is obvious that the officer would not be entitled to receive the benefits until all the conditions prescribed by the San Francisco City Charter have been met. However, as our above decisions make abundantly clear, the *right* to the benefits vests upon acceptance of employment although the right may be lost upon occurrence of a condition subsequent such as lawful termination of employment before it matures [citation] or may not be enforceable because of the nonoccurrence of one or more conditions precedent. [Citations.]'"

We conclude as a matter of law that Roccaforte's right to injury leave pay, his right to retirement benefits as well as his right to reemployment are vested rights and are fundamental in nature within the meaning of *Strumsky, supra, Bixby, supra,* and *Dickey, supra.* Therefore the trial court was required not only to examine into the administrative record for errors of law but to exercise its independent judgment upon the evidence as disclosed "in a limited trial de novo." (*Bixby, supra,* at p. 143.) The trial court must weigh the evidence and exercise its independent judgment upon the weight of the evidence produced. (*Bixby, supra,* p. 143, fn. 10; *Dare* v. *Bd. of Medical Examiners,* 21 Cal.2d 790, 797, 799 [136 P.2d 304].)

The uncertainty as to the standard of review used by the trial court could be resolved by appropriate findings of fact. However, it appears here that no findings of fact or conclusions of law were made nor were any requested. Where as here the applicable scope of review is that

of independent judgment, findings must be made if requested. (Cal. Admin. Mandamus (Cont.Ed.Bar 1966) § 14.2, pp. 234, 235.) Further, and most applicable here is the observation in *Strumsky, supra,* that findings would enable the reviewing party to determine what test the trial court employed in reviewing the administrative decision and the ground upon which it found that test to be applicable. The vagueness and ambiguity of the oral statement of the trial court as to the tests actually·used, when coupled with the failure to supply this court with appropriate findings to allow this court to determine for itself the tests used, leads us to this cul de sac. This court cannot say with certainty what standard was used. What is crystal clear is that no limited trial de novo is evidenced in this record. No resolution of conflicting administrative determinations appears; conflicts in medical testimony abound but remain unresolved. No independent judgment appears to have been exercised to settle these cross-contentions.

If we make the unfounded assumption that the correct standard, the independent judgment test, was used by the court, yet the judgment is in error. ■ An appellate court must sustain the superior court's findings if substantial evidence supports them. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence,* 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

In our quest for substantial evidence to support the trial court's exercise of its independent judgment, we note the Retirement Board relied upon the reports of Drs. Kimball and McDade. Dr. McDade's conclusive— contradicting—findings have been previously underscored. Roccaforte's "hand and finger should be examined in some detail prior to completing my orthopedic evaluation to you." The report of Dr. Kimball is equally lacking in any facts to give substantial evidence in support of the trial court's judgment. Dr. Kimball's conclusion was "he is temporarily totally incapacitated" for any of the duties listed in the attached description. "After another six months he may be then reassessed."

Furthermore, this self-same evidence was viewed by the employer arm of the City, a responsible police officer who concluded Daniel Roccaforte "does not meet the physical qualifications for . . . police officer." These latter conclusions are contradictory and in direct opposition to the decision of Rick Cumming III who found that the injury leave benefits should be terminated "because your doctor has indicated your condition has become permanent and stationary."

The end result of this schizoid approach to the contractual duty owed by the City to Roccaforte is a Catch 22 situation for Roccaforte. Although he was concededly injured in the course of his duties as a police officer and for that reason he has not been permitted to return to duty, yet he is denied any relief during his period of incapacity due to conflicting views taken by different agencies of the same medical reports.

The real party in interest in these proceedings is the City of San Diego. It is bound by contractual agreements with Roccaforte. It is bound by the police department's determination that Roccaforte was not employable by reason of his injuries. ■ While the City has many departments and subdepartments, yet it is a single entity in its contractual obligation. (*Johnson* v. *Fontana County F. P. Dist.,* 15 Cal.2d 380, 391 [101 P.2d 1092].)

The employer branch of the City, the police department, made this critical decision. Roccaforte was unfit for police duties due to a job related injury. This prime determination compelled payment of injury leave pay; or if Roccaforte's injuries were permanent and stationary —and he was still not acceptable for work—an appropriate award by the Retirement Board was in order. The trial court examined the three administrative decisions as separate, unrelated to the City's overall obligation to Roccaforte. This approach permitted the City to avoid its duty to compensate Roccaforte through one of its appropriate agencies for the injuries he received in the course of his police work. It was and is the trial court's duty, after examination of the evidence, contract requirement and applicable law, to exercise its independent judgment, to cut that Gordian knot of conflicting administrative decisions to the end that Roccaforte be awarded that which his employment contract and the medical facts demand.

The City's contention that Roccaforte did not exhaust his administrative remedies is without merit. Roccaforte did not contest the findings by Rick Cumming III that his condition was permanent and stationary. Therefore, he did not appeal this decision. When the Retirement Board adopted the contrarywise position, Roccaforte's appeal time had long since run.

Judgment reversed.

Cologne, Acting P. J., and Wiener, J., concurred.