[No. D002365. Fourth Dist., Div. One. Dec. 5, 1985.]

RONALD L. GATEWOOD, Appellant, v.
BOARD OF RETIREMENT OF THE SAN DIEGO COUNTY
EMPLOYEES' RETIREMENT ASSOCIATION, Respondent.

312

**COUNSEL**

A. J. Daitch for Appellant.

Lloyd M. Harmon, Jr., County Counsel, and Enrique L. Munoz, Deputy County Counsel, for Respondent.

## OPINION

**KREMER, P. J.**—Ronald L. Gatewood applied for and was denied a service-connected disability retirement under Government Code[1] section 31720. The trial court denied Gatewood's petition for a writ of mandate. He alleges (1) the administrative hearing referee and the trial court improperly applied the 1980 amendment to section 31720, (2) the trial court did not exercise independent judgment in reviewing the administrative record, and (3) the evidence is insufficient to support the trial court's judgment. We find the appropriate test for disability was applied, and the administrative record was independently judged. The evidence, however, does not substantially support the superior court's findings. We reverse and direct the trial court to grant Gatewood's mandate petition.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 30, 1982, after serving as a deputy marshal for 14 years, Gatewood alleged a psychiatric disability and stopped working. At that time, he had been under the care of Dr. Allen Abrams, a psychiatrist, for approximately one week. Dr. Abrams stated Gatewood was suffering "a severe stress reaction to conditions at his job." He also prescribed a major tranquilizer and recommended continued therapy.

Treatment continued throughout the summer without significant improvement or change. On October 4, 1982, Gatewood applied to the Board of Retirement of the San Diego County Employees' Retirement Association (Board) for service-connected disability retirement. A referee conducted a hearing and, after reviewing Gatewood's testimony and the independent psychiatric evaluations of Drs. Abrams, J. Brand Brickman and Charles Ettari, concluded Gatewood's incapacity occurred during his tenure as deputy marshal but did not arise out of or in the course of his employment.

The Board accepted the referee's findings and denied both Gatewood's disability application and his subsequent petition for reconsideration. He was, however, granted a nonservice-connected disability retirement. Thereafter, Gatewood petitioned the superior court for a peremptory writ of mandate. The trial court denied the writ.

---

[1]All statutory references are to the Government Code unless otherwise specified.

DISCUSSION

I

Section 31720 establishes the test for service-connected disability. When Gatewood was first hired, section 31720 provided: "Any member permanently incapacitated for the performance of duty shall be retired for disability regardless of age if, and only if; [¶] (a) His incapacity is a result of injury or disease arising out of and in the course of his employment, . . ." In 1980 the Legislature amended section 31720: Service-connected disability retirement would be granted if, and only if, "[t]he member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, and *such employment contributes substantially to such incapacity*, . . ." (Italics added.) Also, the amended test was to apply to all disability candidates applying on or after the effective date of the amendment, January 1, 1981.[2] (Stats. 1980, ch. 240, § 1, p. 482.)

■ Gatewood first contends the referee and trial court erred in applying the test set out in the 1980 amendment of section 31720. He reasons the terms of preamended section 31720 were incorporated as a part of his pension benefits at the time of his hiring and have long since vested and constitutionally can now be neither modified nor impaired. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)

Gatewood's hypothesis, however, fails for either of two reasons. First, the 1980 amendment does *not* effect a change in the test for service-connected disability. That is, perceptible differences between the amended and preamended versions of section 31720 are semantic, not substantive. Second, even though Gatewood's disability pension rights did vest, these rights were not immutable. We begin our analysis with the legislative history of the 1980 amendment.

■ The Legislature provided several clues to the intended scope of the 1980 amendment of section 31720. The amendment was originally introduced on April 3, 1979, as Senate Bill No. 1076. (Sen. Bill No. 1076 (1979-1980 Reg. Sess.) § 1.) The Assembly's Office of Research in its analysis of the bill stated: "This bill is one of numerous measures in response to a recent court decision, *Heaton vs. the Marin County Board of Retirement*, [(1976) 63 Cal.App.3d 421] which stated that a member is entitled to a

---

[2]Gatewood applied well after January 1, 1981. Thus, this case does not involve the retroactive application of the 1980 amendment to disability applications filed before, though not resolved by, the effective date, an issue pending in our Supreme Court in *Hoffman* v. *Board of Retirement* (L.A. 32073, rev. granted June 6, 1985) and *Bowen* v. *Board of Retirement* (L.A. 32072, rev. granted June 6, 1985).

service-connected disability if (1) he or she is permanently unable to perform his or her job, and (2) *any* part of the disability is job-connected. In light of this decision, many '37 Act counties believe that changes must be made in existing law or the cost of the county disability programs will continue to grow and finally become prohibitive." (Assem. File Analysis, Sen. Bill No. 1076, June 5, 1980.)

In *Heaton* the retirement board challenged the interpretation of section 31720 which allowed service-connected disability even though the work-related cause was incalcuably small. The Court of Appeal responded: "In support of its contention, appellant [Retirement Board] first maintains that Government Code section 31720 by its very language indicates that the circumstances of retirement disability should be limited to only the most extreme cases. Appellant cites to the language 'if, and only if' to demonstrate legislative intent in this regard. A closer look at this provision merely evidences the legislative intent that retirement disability be awarded 'if, and only if' the injury is *service-connected.* It does not in any way refer to some requisite seriousness of injury as a condition for disability retirement. The statute simply limits retirement disability to cases where the injury arose out of and in the course of employment." (*Heaton* v. *Marin County Employees Retirement Bd.* (1976) 63 Cal.App.3d 421, 427 [133 Cal.Rptr. 809].)

The *Heaton* court responded similarly to the retirement board's fundamental argument recast to apply to mental disability: "Appellant's final argument is basically that this court should rewrite Government Code section 31720 to require that the employment must be the *sole* cause where the permanent incapacity is due to mental, rather than physical disability. This, appellant contends, is because it is completely beyond the art of the psychiatrist to delimit causation of psychiatric disorders. Thus, in every case (such as here) where the symptomatology is somewhat subjective, the expert would as a matter of course conclude that a contributing cause was a preexisting condition, family life, or employment conditions. Appellant argues this works an unfair result under retirement law, since even an infinitesimal contribution to the disability might require full compensation, whereas under workers' compensation law, an employer bears only his share of what he has been found to have caused.

"It appears that appellant's remedy, here too, is with the Legislature. Appellant points to no authority which would compel this court to rule that an employee suffering a mental disability as a result of employment is required to bear a heavier and different burden than one who sustains a purely physical disability. . . . This court has no authority to rewrite the law to conform to appellant's view of what it should be. . . ." (*Heaton* v. *Marin*

*County Employees Retirement Bd., supra,* 63 Cal.App.3d at pp. 430-431.) While the court's rejection of the Retirement Board's arguments does not necessarily warrant the conclusion "inconsequential" or "infinitesimal" work-related contributions to disability require full compensation, several trial courts have construed *Heaton* in this manner. (See, e.g., *Van Hook* v. *Board of Retirement* (1983) 148 Cal.App.3d 714, 716, fn. 1 [196 Cal.Rptr. 186]; *DePuy* v. *Board of Retirement* (1978) 87 Cal.App.3d 392, 396 [150 Cal.Rptr. 791, 12 A.L.R.4th 1150].)

As originally introduced, Senate Bill No. 1076 responded to this perceived broadening of the test by redefining service-connected incapacity as "the *principal* result of a substantial employment-caused injury or disease." (Sen. Bill No. 1076 (1979-1980 Reg. Sess.) § 1, italics added.) The later Assembly amendment returned to, but refined, the original statutory language: "The member's incapacity is a result of injury or disease arising out of and in the course of the member's employment, *and such employment contributes substantially to such incapacity, . . .*" (Assem. Amend. to Sen. Bill No. 1076 (1979-1980 Reg. Sess.) May 6, 1980, italics added.) As the Assembly noted: "According to the Assembly Public Employee's Retirement Committee analysis, the May 6th amendments reflect a compromise between supporters of the bill and representatives from labor who strenuously opposed the bill as it was introduced." (Assem. File Analysis, Sen. Bill No. 1076, June 5, 1980.) From this history, we may conclude the Legislature intended to disavow the implications of *Heaton* but did not go so far as requiring the disability be the principal result of an employment-caused injury or illness. In other words, "contributes substantially" means more than "any" and less than "principal." Beyond this rough bracketing, however, the Legislature provided no clear guide to interpret "contributes substantially."

Faced with construing this language, the Court of Appeal in *Lundak* v. *Board of Retirement* (1983) 142 Cal.App.3d 1040 [191 Cal.Rptr. 446], turned to the Restatement Second of Torts for assistance. The court relied on comment a to section 431 to define "substantial." We recite the definition, modifying it to apply to the present, rather than a negligence, context: "'The word "substantial" is used to denote the fact that the [member's employment] has such an effect in producing the [injury or disease] as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. . . .'" (*Lundak* v. *Board of Retirement, supra,* 142 Cal.App.3d at pp. 1045-1046, citing Rest.2d Torts, § 431, com. a.)

In support of its definition, the *Lundak* court reasoned: "Using this definition of substantial in applying Government Code section 31720, as amended, does not abrogate the Legislature's intent to restrict the *Heaton* court's liberality in awarding service-connected disability benefits; a substantial contribution, thus defined, would not include *any* contribution of employment disability, no matter how small and remote. At the same time, the use of this definition permits adherence to the well-settled principle, cited above, that pension legislation must be applied fairly and broadly." (*Id.*, at p. 1046.)

This reasoning emphasizes the most salient aspect of legislative action regarding the 1980 amendment. The Legislature did not target all case law construing section 31720 for eradication. It took aim *only* at the language in *Heaton.* (Assem. File Analysis, Sen. Bill No. 1076, June 5, 1980.) Mindful of this objective, the *Lundak* court did not "find" a new test for service-connected disability so much as it refined preamendment formulations. Indeed, once the *Heaton* implications are checked, there is *no significant difference* between the pre- and postamended section 31720 tests for disability. For example, under preamended section 31720 we concluded in *DePuy* v. *Board of Retirement, supra,* 87 Cal.App.3d 392, that "while the causal connection between the stress and the disability may be a small part of the causal factors, it must nevertheless be *real and measurable.* There must be substantial evidence of some connection between the disability and the job. The trial court erred in its conclusion the law of California requires the award of service-connected disability retirement benefits where there is an 'infinitesimal' and 'inconsequential' connection between the pensioner's duties and his disability." (*Id.*, at p. 399, italics added; but cf. *Bechtel* v. *Board of Retirement* (1980) 102 Cal.App.3d 9, 15 [162 Cal.Rptr. 154], and *Gelman* v. *Board of Retirement* (1978) 85 Cal.App.3d 92, 96-97 [149 Cal.Rptr. 225], relying on *Heaton* v. *Marin County Employees Retirement Bd., supra,* 63 Cal.App.3d 421.) An impairment that makes a "real and measurable" contribution to a pensioner's disability would certainly "lead reasonable men to regard it as a cause" of the disability. Thus, both versions of section 31720, absent the influence of *Heaton* and its progeny, effect the same test for service-connectedness, that is, a test which, as previously stated, recognizes more than "any," but less than "principal" cause. ■
Viewed in this light, applying amended section 31720 cannot be said to impair Gatewood's contract rights. Moreover, under the present circumstances Gatewood's pension rights, though vested, may nevertheless be modified.

■ In California, "[a] public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment." (*Betts* v. *Board of Administration* (1978)

21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614].) This principle applies with equal force to disability pensions and accords the disability pensioner state and federal constitutional protection against impairment of contractual pension rights. (*Frank* v. *Board of Administration* (1976) 56 Cal.App.3d 236, 241-243 [128 Cal.Rptr. 378]; *Cochran* v. *City of Long Beach* (1956) 139 Cal.App.2d 282, 286 [293 P.2d 839]; see *Newman* v. *City of Oakland Retirement Bd.* (1978) 80 Cal.App.3d 450, 458 [145 Cal.Rptr. 628].) ▉ However, not every change in a retirement law impairs a contractual obligation, nor does every impairment run afoul of the contract clause. (*Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 245 [57 L.Ed.2d 727, 736, 98 S.Ct. 2716]; *Allen* v. *Board of Administration* (1983) 34 Cal.3d 114, 119 [192 Cal.Rptr. 762, 665 P.2d 534], app. dism. (1984) 465 U.S. 1015 [79 L.Ed.2d 669, 104 S.Ct. 1262].) "The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their 'just and reasonable purport;' not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. [Citations.]" (*Lyon* v. *Flournoy* (1969) 271 Cal.App.2d 774, 782 [76 Cal.Rptr. 869], app. dism. (1970) 396 U.S. 274 [24 L.Ed.2d 465, 90 S.Ct. 564].)

In applying this principle to retirement laws, our courts have determined the "public pension system is subject to the implied qualification that the governing body may make reasonable modifications and changes before the pension becomes payable and that until that time the employee does not have a right to any fixed or definite benefits but only to a substantial or reasonable pension." (*Wallace* v. *City of Fresno* (1954) 42 Cal.2d 180, 183 [265 P.2d 884]; accord *International Assn. of Firefighters* v. *City of San Diego* (1983) 34 Cal.3d 292, 300-301 [193 Cal.Rptr. 871, 667 P.2d 675]; *Miller* v. *State of California* (1977) 18 Cal.3d 808, 816 [135 Cal.Rptr. 386, 557 P.2d 970]; *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 854-855 [179 P.2d 799].) ▉ The Supreme Court established the scope of permissible modification in *Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765] and *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 449 [326 P.2d 484]. As applied to active employees such as Gatewood, the *Allen-Abbott* guidelines require any modification of pension rights (1) must be reasonable, (2) must bear a material relation to the theory and successful operation of the pension system, and (3) when resulting in disadvantage to employees, must also afford comparable new advantages. (Accord *Allen* v. *Board of Administration, supra,* 34 Cal.3d at p. 120.)

▉ ▉ ▉ ▉ ▉ Having construed the 1980 amendment of section 31720 as effecting no perceptible change in Gatewood's vested pension

rights, we now find review under the *Allen-Abbott* guidelines unnecessary.[3] However, even assuming, as Gatewood argues, the amendment did indeed modify his contract rights, this modification would still be constitutionally permissible. The amendment does not eliminate service-connected disability pensions; nor does it reduce benefits. (See, e.g., *Allen* v. *City of Long Beach, supra,* 45 Cal.2d at p. 131; *Kern* v. *City of Long Beach, supra,* 29 Cal.2d at pp. 854-855.) It does, however, reasonably refine the threshold criteria for award of a service-connected disability. Indeed, the Legislature, in reaching the final version of the 1980 amendment *rejected* the more rigorous test which was originally proposed. (Assem. Amend. to Sen. Bill No. 1076 (1979-1980 Reg. Sess.) May 6, 1980.) The legislative history also reveals the amendment's material relationship to the successful operation of disability pension programs. After *Heaton,* county governments feared a significant increase in service-connected disability applications. As the Assembly stated in its analysis: "In light of this decision [*Heaton*], many '37 Act counties believe that changes must be made in existing law or the cost of the county disability programs will continue to grow and finally become prohibitive." (Assem. File Analysis, Sen. Bill No. 1076, June 5, 1980.) The 1980 amendment was intended to palliate this concern. Finally, whatever disadvantage Gatewood experienced as a consequence of the amendment of section 31720, that disadvantage is counterbalanced by section 31727.7's[4] expanded *nonservice-connected disability benefits* which presumably are available to Gatewood at his election.

---

[3]"Laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract." (*El Paso* v. *Simmons* (1965) 379 U.S. 497, 515 [13 L.Ed.2d 446, 458, 85 S.Ct. 577].)

[4]Section 31727.7 was originally proposed as section 2 of Senate Bill No. 1076 and added to the Government Code contemporaneously with the amendment of section 31720 by Statutes 1980, chapter 240, section 2, page 482. Section 31727.7 was amended in 1981, and at the time of Gatewood's disability application provided:

"Upon retirement for nonservice-connected disability, in lieu of any other allowance, a member who has five years or more credited service shall receive a disability allowance equal to the percentage of final compensation set forth opposite the member's number of years of credited service in the following table:

| Years of credited service: | Percentage of final compensation: |
| --- | --- |
| Five years, but less than six years | 20.0 |
| Six years, but less than seven years | 22.0 |
| Seven years, but less than eight years | 24.0 |
| Eight years, but less than nine years | 26.0 |
| Nine years, but less than ten years | 28.0 |
| Ten years, but less than eleven years | 30.0 |
| Eleven years, but less than twelve years | 32.0 |
| Twelve years, but less than thirteen years | 34.0 |
| Thirteen years, but less than fourteen years | 36.0 |
| Fourteen years, but less than fifteen years | 38.0 |
| Fifteen or more years | 40.0 |

## II

■ Gatewood next contends the trial court erroneously employed a substantial evidence standard of review. ■ In a mandamus proceeding involving fundamental or vested rights, such as Gatewood's right to disability retirement benefits, or whenever authorized by law, the trial court must independently judge the administrative record to determine if the findings were supported by the weight of the evidence. (Code Civ. Proc., § 1094.5, subd. (c); *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29].) The substantial evidence standard is applied in all other cases. (Code Civ. Proc., § 1094.5, subd. (c).) ■ Gatewood grounds his contention on a single statement in the judgment: "The findings of the respondent are supported by the evidence; . . ." However, in the very next sentence the trial court states: "That in the independent judgment of the Court the decision of the respondent was supported by the evidence; . . ." Neither the statement cited by Gatewood nor inferences derived therefrom can support his argument in light of the court's express statement to the contrary. We find nothing in this record to indicate the trial court did other than independently judge the evidence.

## III

■ Finally, Gatewood challenges the sufficiency of the evidence supporting the trial court's findings. ■ Preliminarily, we note "[w]here a superior court is required to make . . . an independent judgment upon the record of an administrative proceeding, the scope of review on appeal is limited. An appellate court must sustain the superior court's findings if substantial evidence supports them." (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53]; accord *Roccaforte* v. *City of San Diego* (1979) 89 Cal.App.3d 877, 887 [152 Cal.Rptr. 558].) We review the evidence in light of the 1980 amendment of section 31720.

---

"This section shall only apply to the following persons:

"(a) Persons who become members of the retirement system after the operative date of this section in the county.

"(b) Those persons who were members prior to such operative date who, pursuant to a memorandum of understanding with their bargaining unit, elect to be subject to this section on or after such operative date.

"(c) Management and confidential employees and employees not a part of a bargaining unit who were members prior to such operative date and elect to be subject to this section on or after such operative date. The board of supervisors shall prescribe the time period and conditions governing the election.

"This section shall not be operative in any county until such time as the board of supervisors by majority vote makes the provisions of this section applicable in such county."

 All three psychiatrists concur in Gatewood's psychiatric diagnosis, paranoia, and all agree he manifested prodromal symptoms at an early age. All further agree Gatewood's social and work adjustment was relatively unremarkable until the past five to seven years. They apparently disagree, however, as to the etiology of Gatewood's worsening paranoid symptoms. Dr. Abrams, Gatewood's treating psychiatrist, and Dr. Brickman both unequivocally state Gatewood's psychological condition was work related. In Dr. Abrams' view, Gatewood's emotional illness had a gradual and insidious onset and was clearly exacerbated by his preoccupation with and anxiety about the "inequity" of criminal justice and his own role in the justice system. Similarly, Dr. Brickman found Gatewood nurtured a delusional sense of "mission" which left him vulnerable to disillusion, distrust and distress. From this, Dr. Brickman concluded Gatewood's increasing dysfunction "must be considered entirely work related."

From his report and testimony, Dr. Ettari appears to disagree with Drs. Abrams and Brickman. He concluded the emergence of Gatewood's paranoia while he was a deputy marshal did not "make the employment *ipso facto* the cause of the disability." However, Ettari's responses to close questioning at the administrative hearing indicate his findings are more harmonious with those of the other examining psychiatrists than his conclusion would suggest. On cross-examination, Dr. Ettari testified Gatewood's paranoia centers on a theme of injustice. The questioning continued:

"[Counsel:] Do you think that Mr. Gatewood had that theme, was centered upon that theme prior to becoming employed as a deputy marshal?

"[Dr. Ettari:] Probably not.

"Is it that theme and *the frustration and anger and rage that flows from that theme that you think gives rise to Mr. Gatewood's present condition of paranoia?*

"Yes.

"Do you think that Mr. Gatewood would have come up with that theme and the resultant frustration and anger and rage were it not for the fact that he had become employed as a deputy marshal?

"He could have and not have. . . . It depends on the situation, the type of work he was in. If he was in work that probably involved close contact with other people, rules, regulations, authority figures and so forth, most probably he would have had the same disorder. . . .

"So then *this disorder,* in your opinion, *arises out of the fact Mr. Gatewood was employed in a position where he came into contact with rules, regulations and orders, people who were in authority over him and social expectations?*

*"That's correct.*

"Can you point to any other job that Mr. Gatewood has had that fills that particular description?

"Well, I'd have to look at my report and see what other things he's done. There were several other jobs . . . he has worked on. [¶] [H]e's worked a drill press, worked as a printer, in sales for Sears Roebuck, in photocopy repair prior to his employment as a deputy marshal. [¶] In answer to your question, yes, I think he did involve himself with other people prior to his work as a deputy marshal.

*"Did any of those jobs* cause him to have a permanent disability prior to his employment as a deputy marshal?

"No.

" . . . . . . . . . . . . . . . . . . . . .

"And it's also your testimony, then, that it's as a result of the fact that he was employed for the past fifteen years in this job, contacting people, being subject to rules and being subject to supervisors and superiors and societal expectations that this particular theme arose which gave rise to Mr. Gatewood's paranoia?

" . . . . . . . . . . . . . . . . . . . . .

"Perhaps this will answer the question: It is my opinion that Mr. Gatewood's inter-action [*sic*] with people, rules, regulations, authority figures, those things that we normally associate with societal work that *caused him at that time to manifest symptoms of paranoia.*" (Italics added.)

Although psychiatrically Dr. Ettari is most concerned about the central core of Gatewood's paranoia, it is clear from his testimony that Gatewood's paranoid symptoms did, in a legal sense, arise out of and were substantially contributed to by his employment. ■■ ■■■■ ■■ ■■ Thus, from our review of all of the psychiatric reports and testimony, we find there is no

substantial evidence to support the trial court's finding that Gatewood's disability was not service-connected.[5]

### DISPOSITION

Judgment reversed with directions to grant the petition for writ of mandate.

Work, J., and Butler, J., concurred.

---

[5]Gatewood also requests attorney's fees under section 800. However, the Board's action was neither arbitrary nor capricious. (*Verdugo Hills Hospital, Inc.* v. *Department of Health* (1979) 88 Cal.App.3d 957, 964 [152 Cal.Rptr. 263].) Thus, section 800, by its terms, cannot apply here, and Gatewood's request must fail.