[Civ. No. 12110.　Third Dist.　Apr. 14, 1969.]

NANCY P. LYON, Petitioner, v. HOUSTON I. FLOURNOY, as State Controller, et al., Respondents.

---

[1]Black's Law Dictionary (4th ed. 1951), Webster's Third New Internat. Dict. (1968).

Dickey & Dickey, Francis T. Cornish and Randal F. Dickey, Jr., for Petitioner.

Thomas C. Lynch, Attorney General, and William J. Power, Deputy Attorney General, for Respondents.

FRIEDMAN, Acting P. J.—This is a mandate action commenced in this court. The State Controller and the Board of Administration of the State Employees' Retirement System are the respondents.

Nancy Lyon, the petitioner, is the widow of the late Charles W. Lyon, who served as a member of the California Legislature for 34 years. At the beginning of 1955 Mr. Lyon commenced drawing a monthly retirement allowance under the provisions of the Legislators' Retirement Law (Gov. Code, § 9350 et seq.). He selected an optional settlement paying him a modified allowance during his lifetime and providing his widow one-half that allowance during her life. He died in July 1960 and Mrs. Lyon then commenced drawing her monthly allowance as his surviving spouse.

Since its enactment in 1947, the retirement law has set the basic benefit amount at 5 percent of the compensation payable

to members of the Legislature "at the time payments of the allowance fall due," multiplied by the years of the individual's legislative service, not exceeding 15. This formula is now expressed in Government Code section 9359.1.[1] It ties retirement allowances to legislative salaries as fixed from time to time, thus providing a fluctuating scale of retirement payments. When the retirement law was adopted in 1947, legislators were receiving a salary of $100 per month. Successive constitutional amendments increased the monthly salary to $300 in 1949 and $500 in 1954. The latter was the salary rate when Mr. Lyon retired at the beginning of 1955.

The 1963 Legislature established an additional fluctuation feature, which is now found in Government Code section 9360.9. First operative upon retirement allowances payable in 1964, it directed adjustment of these allowances to reflect percentage increases in cost of living which had occurred from the base year 1954 up through 1963, with an annual increase in 1964 and each subsequent calendar year proportioned to the cost-of-living increase in the preceding year.[2] Apparently Mrs. Lyon's monthly payments reflected these cost-of-living

[1]Government Code section 9359.1 provides in part: "(a) The retirement allowance for a member all of whose credited service was rendered as a Member of the Senate or Assembly . . . is an annual amount equal to five percent (5%) of the compensation payable, at the time payments of the allowance fall due, to incumbent Members of the Senate or Assembly, multiplied by the number of years of service with which the member is entitled to be credited at the time of his retirement, not to exceed fifteen (15) years. In no event shall any retirement allowance payable under this chapter to any such member exceed the compensation payable to Members of the Legislature at the time the payment of the allowance is made, except that the retirement allowance of any such member who serves more than 15 years shall be increased by an amount equal to 3 percent of the compensation payable, at the time payment of the allowance falls due, to incumbent Members of the Senate or Assembly for each year or fraction of a year in excess of 15 years."

[2]Government Code section 9360.9 states:

"Notwithstanding any other provisions of this chapter the provisions of this section shall be applicable to all allowances granted by this chapter commencing with each installment paid or payable on or after January 1, 1964.

"On or before January 1, 1964, the board shall adjust the amount of the allowances payable during the 1964 calendar year to reflect any increase in cost of living occurring between the 1963 calendar year and the 1955 calendar year, inclusive, and any increase resulting from such adjustment shall be payable commencing with each installment of allowances paid or payable on or after January 1, 1964. On or before January 15, 1965, and, on or before January 15 of each year thereafter, the amount of the allowances provided by this chapter shall be adjusted by the board to reflect any increase in cost of living occurring after January 1 of the immediately preceding calendar year. The average of the separate indices of the cost of living for Los Angeles and San Francisco, as published by the United States Bureau of Labor Statistics shall be used

increases, because her petition alleges that she received all amounts due her until January 1, 1967.

At the November 8, 1966, general election, California voters ratified an extensive partial revision of the State Constitution, which appeared on the ballot as Proposition 1-A. Parts of this proposition repealed the former provision fixing legislators' monthly salaries at $500, authorized the Legislature to adjust the salaries of its own members within certain limits and validated a 1966 statute fixing these salaries at $16,000 per year commencing January 2, 1967. (See Cal. Const., art. IV, § 4, and art. XXII, § 6, as adopted Nov. 8, 1966; Gov. Code, § 8901.) Included in article IV, section 4 (the new constitutional provision on legislative salaries) was an exclusionary clause designed to prevent the augmented 1967 salary from becoming a factor in the retirement allowances of legislators retired before 1967 and their widows. The clause declares: ''The Legislature may not provide retirement benefits based on any portion of a monthly salary in excess of 500 dollars paid to any member of the Legislature unless the member receives the greater amount while serving as a member in the Legislature.''

In preparation for the 1966 constitutional revision, the Legislature had adopted a parallel provision as part of the Legislators' Retirement Law. This is Government Code section 9359.11, which states: ''Any contrary provisions of Section 9359.1 notwithstanding, in computing the retirement allowance of a legislator member of the Legislators' Retirement System whose service as a legislator ended prior to the term commencing in 1967, the salary to which the applicable formula shall be applied shall be five hundred dollars ($500) per month, and any increase in salary of legislators above such amount shall be disregarded for such purpose.''

In her petition Mrs. Lyon alleges that the respondents are

as the basis for determining the changes in the cost of living. The cost of living increase shall equal or exceed 1 percent before any adjustment is made in the allowance. The calendar year 1954 shall be used as the base year in computing any annual adjustment. The annual adjustment made on or before January 15, 1965 and made on or before January 15 of each calendar year thereafter shall correspond to the average annual change in the calendar year immediately preceding the year during which the adjustment shall be effective. The adjustment made on or before January 1, 1964, shall correspond to the total of the average annual changes in each calendar year from the 1955 calendar year to the 1963 calendar year, inclusive.

''The adjustment provided by this section shall be made only if it operates to effect an increase over the allowance payable for the calendar year immediately preceding.''

complying with the exclusionary provisions of California law and have continued to compute her monthly retirement allowance on the basis of the $500 monthly (or $6,000 annual) salary payable to legislators before 1967. She seeks a writ of mandate compelling them to follow the "fluctuation" formula of Government Code section 9359.1 and to pay her a monthly allowance computed upon the basis of the current $16,000 annual salary of legislators. She contends that the laws denying her this basis of computation are repugnant to the contract and equal protection clauses of the federal Constitution. She declares that 96 retired legislators or legislative widows share her predicament.[3]

The contract clause of the federal Constitution (art. I, § 10) prohibits any state from passing a law "impairing the obligations of contracts." The California Constitution (art. I, § 16) declares a parallel inhibition. The federal provision applies to any enactment to which the state gives the force of law, including its Constitution. (*Russell* v. *Sebastian* (1914) 233 U.S. 195 [58 L.Ed. 912, 34 S.Ct. 517]; *New Orleans Gas Light Co.* v. *Louisiana Light, etc. Co.* (1885) 115 U.S. 650, 672-673 [29 L.Ed. 516, 524-525, 6 S.Ct. 252]; Rottschaefer, Constitutional Law (1939) p. 560.)

While some jurisdictions view public employees' retirement rights as a gratuity, California is firmly committed to the proposition that these rights are contractual; that they are "vested" in the sense that the lawmakers' power to alter them after they have been earned is quite limited. (See cases collected 52 A.L.R.2d 437, 444-451.) *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848 [179 P.2d 799], is apparently the first California decision assigning this limitation squarely to the impairment of contract clause, stating: "[853] Since a pension right is 'an integral portion of contemplated compensation' [Citation], it cannot be destroyed, once it has vested, without impairing a contractual obligation. . . . [855] Thus it appears, when the cases are considered together, that an employee may acquire a vested contractual right to a pension but that this right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which he serves. The statutory language is subject to the implied

[3]The petition for mandate does not allege the filing of a claim covering retirement allowances alleged to be past due, but the respondents make no point of the matter. See Gov. Code § 900 et seq.; *Adler* v. *City of Pasadena* (1962) 57 Cal.2d 609, 613 [21 Cal.Rptr. 579, 371 P.2d 315]; *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 464-466 [326 P.2d 484].

qualification that the governing body may make modifications and changes in. the system. The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension. There is no inconsistency therefore in holding that he has a vested right to a pension but that the amount, terms and conditions of the benefits may be altered.''

In *Terry* v. *City of Berkeley* (1953) 41 Cal.2d 698 [263 P.2d 833], the court invalidated an amendment which, after an employee's retirement, sought to substitute a retirement allowance tied to his pre-retirement salary for one which fluctuated with current salaries. The court implied that post-retirement changes in the retirement system are more rigidly confined than those which precede retirement, stating: '' [702-703] *Kern* v. *City of Long Beach,* 29 Cal.2d 848 [179 P.2d 799] . . . [is] authority for the proposition that reasonable changes detrimental to the pensioner may be made in pension provisions for public employees or their beneficiaries before the happening of the contingency. . . . In the present case the plaintiff had been retired; he had rendered the called-for performance; he had done everything possible to entitle him to the payment of his pension and all conditions precedent to the obligation of the city were fulfilled upon the determination that he be retired as a result of his service-connected disability. The pension payments are in effect deferred compensation to which the pensioner becomes entitled upon the fulfillment of the terms of the contract which may not be changed to his detriment by subsequent amendment. [Citations.]''

*Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128 [287 P.2d 765], nullified a retirement law change which, as to current employees, proposed substitution of a fixed pension for one which fluctuated with current salaries. In terms somewhat different from those of the *Kern* opinion, the court restated the extent and limits of the power of alteration: '' [131] An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. [Citations.] Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages. [Citations.] . . .''

In *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438 [326 P.2d 484], the court abrogated an attempt to substitute a fixed for a fluctuating retirement allowance of previously retired employees, declaring: ''[449] . . . [I]t is advantage or disadvantage to the particular employes whose own contractual pension rights, already earned, are involved which are the criteria by which modifications to pension plans must be measured. . . .'' The court held [454-455] that the same relative immunity from impairment attended the widows of retired employees.

Respondents contend that the retirement rights in question are outside the pale of the federal contract clause because (as a matter of federal law) statutes fixing the compensation of state officers create no contract and may be altered at the legislative will. (See, e.g., *Dodge* v. *Board of Education* (1937) 302 U.S. 74, 78-79 [82 L.Ed. 57, 62, 58 S.Ct. 98]; Note, 52 A.L.R.2d at pp. 443-444.) Further, the federal courts view the pension rights of public employees as a gratuity, alterable at the employer's will. (See cases cited, 52 A.L.R. 2d at pp. 443-444.) An unspoken extension of this argument is that the 1966 restriction escapes the contract clause of the state Constitution as well, amendments to the California Constitution being substantively free of preexisting limitations in that instrument.

Although somewhat plausible, the contention is inacceptable. There exists in California today a body of decisional law placing earned retirement rights within the shelter of the prohibition against contract impairment, without specific citation of either the federal or state clauses. (See, for example, *Kern* v. *City of Long Beach, supra,* 29 Cal.2d at pp. 850, 853.) Certainly the California pension decisions have never rejected the federal clause as a source of the protection. It is now too late to do so. California law places earned pension rights of public officers and employees under the protection of the contract clause regardless of any characterization adopted by the federal courts. At least as an initial matter, the California courts may determine whether the provisions of the state Constitution conform to federal constitutional standards. (*Mulkey* v. *Reitman* (1966) 64 Cal.2d 529-533 [50 Cal.Rptr. 881, 413 P.2d 825].) It is likely that the state courts' characterization would be accepted by the federal Supreme Court. (See *Reitman* v. *Mulkey* (1967) 387 U.S. 369, 373-374 [18 L.Ed.2d 830, 834, 87 S.Ct. 1627]; *Hale* v. *Iowa State Board* (1937) 302 U.S. 95, 101 [82 L.Ed. 72, 76, 58 S.Ct. 102].)

Indeed, once services have been performed by a state officer under a law specifying his compensation, an implied contract arises to which the federal contract clause extends. (*Mississippi* v. *Miller* (1928) 276 U.S. 174, 179 [72 L.Ed. 517, 520, 48 S.Ct. 266].) For the purpose of the present litigation, suffice it to hold that the change in the legislators' retirement system promulgated by the 1966 amendment of article IV, section 4 of the California Constitution is not immune from the contract clause of the federal Constitution.

Before reaching the impairment question, it is necessary to perceive the obligation alleged to be impaired. (*Home Building & Loan Assn.* v. *Blaisdell* (1934) 290 U.S. 398, 429-430 [78 L.Ed. 413, 424, 54 S.Ct. 231, 88 A.L.R. 1481].) The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their ''just and reasonable purport;'' not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. (*City of El Paso* v. *Simmons* (1965) 379 U.S. 497, 508 [13 L.Ed.2d 446, 454-455, 85 S.Ct. 577] ; *Home Building & Loan Assn.* v. *Blaisdell, supra,* 290 U.S. at pp. 428-429, 434-435 [78 L.Ed. at pp. 423, 426-427].) The contract clause and the principle of continuing governmental power are construed in harmony ; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains ''reasonably to be expected from the contract.'' (*City of El Paso* v. *Simmons, supra,* 379 U.S. at p. 515 [13 L.Ed.2d at p. 458].) Constitutional decisions ''have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change.'' (*Ibid;* see 70 Dick. L.Rev. 524-534 (1966) ; 56 Colum. L.Rev. 251-270 (1956).)

Quite consistently, but in somewhat different language, the California retirement decisions recognize a residuum of continuing governmental power to adopt limited changes. In brief, modifications affecting the earned pension rights of active employees must be reasonable, related to the theory of a sound pension system, and changes detrimental to the individual must be offset by comparable new advantages. (*Abbott* v. *City of Los Angeles, supra,* 50 Cal.2d at pp. 447, 449 ; *Allen* v. *City of Long Beach, supra,* 45 Cal.2d at pp. 131-133.)

■ As to previously retired employees and their widows, the scope of continuing governmental power is less clear, possibly more restricted. At this point it is said that the pension is deferred compensation, that the retired beneficiary is entitled to the fulfillment of his contract, which may not be changed to his detriment. (*Abbott* v. *City of Los Angeles, supra*, 50 Cal. 2d at p. 455; *Terry* v. *City of Berkeley, supra*, 41 Cal.2d at p. 703.) Nevertheless, even here, it is necessary to perceive the terms of the contract and to utilize those terms to measure the claimed impairment.

■ The nature and extent of the obligation are ascertained not only from the language of the pension provision, but also from the judicial construction of this or similar legislation at the time the contractual relationship was established. (*Kern* v. *City of Long Beach, supra*, 29 Cal.2d at p. 850; see *Louisiana* ex rel. *Southern Bank* v. *Pilsbury*, 105 U.S. 278 [26 L.Ed. 1090]; Cooley's Constitutional Limitations (8th ed. (1927) p. 585.)

■ Literally, the contractual language (i.e., Gov. Code, § 9359.1, fn. 1, *supra*) established a continuing mathematical relationship between the monthly benefit and current legislative salaries. The mathematical relationship was a means of attaining an objective common to many retirement systems: to enable retired employees to maintain a fairly constant standard of living despite fluctuations in living costs. That kind of arrangement depends upon an assumption. The assumption is that the salary-fixing agency, in fairness to active employees, will adjust their salaries to inflationary price levels. The mathematical tie-in automatically achieves a corresponding adjustment in the income of retired employees.

That the objective of the mathematical relationship is to reflect shifts in dollar-purchasing power was noted in California at least as early as *Aitken* v. *Roche* (1920) 48 Cal.App. 753, 760 [192 P. 464]. It was reiterated in *Casserly* v. *City of Oakland* (1936) 6 Cal.2d 64, 69 [56 P.2d 237], and restated more elaborately in later decisions such as *Allen* v. *City of Long Beach, supra*, and *Abbott* v. *City of Los Angeles, supra*. In all these cases the employer sought to withhold a fluctuating allowance after it had been earned and to substitute one tied to the employee's salary at his retirement. The *Allen* decision, 45 Cal.2d at page 132, describes how the attempted substitution damages the theory and objective of the fluctuation formula: ''Payment of a fixed amount freezes the benefit at a figure which is based on salary scales preceding retire-

ment, thus the longer an employee is retired on a fixed pension the more likely it is that the amount of his pension will not accurately reflect existing economic conditions, whereas a retired employee receiving a fluctuating pension based on the salaries that active employees are currently receiving can maintain a fairly constant standard of living despite changes in our economy. We are at present in an era of rising salaries and high cost of living. . . . It is, of course, impossible to predict with certainty whether, at the time of retirement of each of the employees here involved, the amount paid him under a provision for a fixed benefit would be greater or less than that paid him under a fluctuating benefit system, but that very uncertainty indicates the advantage of a plan for fluctuating benefits which attempts, however roughly, to reflect the actual purchasing power of the dollar.''

This case differs significantly from those in which the modification exceeded the permissible scope of ongoing governmental power. In the prior cases the public employer had attempted to withhold the earned right to an allowance which fluctuated with cost of living, substituting an allowance tied to the pre-retirement salary. Here one fluctuation device has been substituted for another. Mrs. Lyon and others like her continue in their entitlement to cost-of-living increases, for these have been provided since 1964 by Government Code section 9360.9 (fn. 2, *supra*). Increases of the latter variety do not depend upon the salary-fixing authority's willingness to adjust the salaries of active members to inflationary price trends. Instead, the cost-of-living indices of the federal Bureau of Labor Statistics supply the variable which augments the retirement allowance.

An unwilling employer may refuse to raise salaries. Possessing a free choice, unbound by contract, to grant or deny salary raises to active employees, the same choice, unfettered by contract, extends to the allowances of retired employees. Section 9360.9, in contrast, establishes a direct and rigid connection with cost-of-living levels, eliminating the employer's free choice as an intervening factor. Alhough Mrs. Lyon's petition alleges an allowance based upon a salary of $500 per month or $6,000 per year, the 1969 allowances have been adjusted to reflect a 33.7 percent rise in Bureau of Labor Statistics indices after the base year 1954, the year preceding Mr. Lyon's retirement.

After legislative salaries were increased to $500 in 1954, repeated attempts to liberalize these salaries were defeated at the polls. The 1958 and 1960 state ballots presented constitu-

tional amendments proposed by the Legislature to increase legislative salaries or to permit the Legislature to do so. (Stats. 1959 (1958 1st Ex. Sess.) p. 435; Stats. 1959, p. 5816.) The 1962 ballot contained two such propositions. (Stats. 1963 (1st Ex. Sess. 1962) pp. 406, 417-418.) The voters rejected all four measures.

The 1963 Legislature then adopted the statute coupling the allowances of retired members and their widows to federal cost-of-living indices. The voters' repeated refusal to liberalize current salaries had frustrated the law's objective of maintaining the purchasing power of the retirement benefit. Although the 1963 Legislature could not constitutionally increase the salaries of active members, it could and did supply relief to retired beneficiaries by coupling retirement allowances in 1964 and later years to increases over 1954 cost-of-living levels. This relief was not required by anything in the retirement law. It did fulfill the law's objective of gearing the allowance to current price levels. In the perspective of 1963 the original fluctuation formula was now dormant, for there was no prospect that the voters would raise the salaries of active legislators.

Against this background, the 1966 constitutional revision, with its rejection of the proposed $16,000 salary as a factor in the retirement allowances of existing beneficiaries, was framed and adopted. The original law had held out to the covered employees a fluctuation provision whose theory and objective, whatever its literal means, was to sustain the living standard of the system's beneficiaries. This objective was now being met with a substitute formula, which tied the benefit amount to cost indices rather than current salaries. The sharp salary increase to $16,000 was not tied to the creeping progression of cost indices. Neither had it any relevancy to the retirement law's cost-of-living objective. That objective was being met by the substitute formula, and the 1966 restriction in no way obstructed it.

The Legislators' Retirement Law represents a contributory plan, one partially financed by the contributions of active members. Most contributory retirement plans are funded on an actuarial basis, providing accumulated funds adequate to meet valid claims as they come due. Others, including the legislators' retirement system, cover a relatively small class and are not funded at all; rather, they are financed on a ''cash disbursement'' basis, in which the benefit burden bears no relationship to the adequacy of accumulated reserves. With a plan of the latter sort, contributions during the early years

of operation usually exceed benefit expenditures. As the retirement roll grows, benefit expenditures tend to exceed income. Eventually the drain on the fund may force the employer to impose higher contributions upon active employees or to subsidize the fund himself in order to meet the obligations to retired beneficiaries. (See Survey of Retirement Systems, State of California, Report to Joint Legislative Budget Committee (California Legislative Auditor, 1954-1955) pt. III, pp. 2, 46; Retirement Plans for Public Employees (Municipal Finance Officers Assn. 1946) p. 21; Bernstein, The Future of Private Pensions (1964) p. 44; McGill, Fundamentals of Private Pensions (1964) pp. 202-203, 244-247; Rothman, Establishing and Administering Pension and Profit-Sharing Plans and Trust Funds (Com. on Cont. Ed. Bar 1967, pp. 107-108).)

The Legislators' Retirement Law requires members to contribute 4 percent of their salaries into the Legislators' Retirement Fund (Gov. Code, §§ 9354, 9357). The Legislature makes an annual appropriation equal to the expected excess of benefit expenditures over the accumulated contributions of the beneficiaries. (Gov. Code, § 9358). Petitioner's late husband and other legislators retiring before 1967 had paid the standard contribution of 4 percent on annual salaries of $1,200, then $3,600, then $6,000. From the perspective of the framers of the 1966 amendment, the application of the original formula to these retired beneficiaries raised questions of fundamental fairness as well as financial prudence. To pay them allowances based upon the new $16,000 salary would hand them a bonanza far outstripping their expectations for cost-of-living increases, dwarfing their relatively modest contributions and demanding enlarged appropriations of general tax funds to maintain the retirement system's solvency.[4] In extending a new fluctuation formula in 1963, then withdrawing the original one in 1966, the law-making authority was exercising governmental power reasonably adapted to the public interest, supportive of a sound pension system and not aimed at an arbitrarily selected class.

---

[4] The annual financial reports of the Legislators' Retirement System published by the Board of Administration, State Employees' Retirement System, show member contributions of $40,341.74 in fiscal 1965-1966, $73,206.05 in 1966-1967, and $91,793.71 in 1967-1968. In those same three fiscal years, benefit expenditures were $321,339.67, $411,392.26 and $473,182.59, while state contributions appropriated by the Legislature amounted to $360,000, $370,000, and $510,000, respectively. (Legislators' Retirement System, 20th Annual Financial Report (June 30, 1968) p. 21.)

The dollar difference between an allowance computed upon the new $16,000 salary and one based upon the old $6,000 salary (plus cost-of-living increments) is palpable and undeniable. The 1966 exclusion prevents literal fulfillment of the 1947 law's provision for a pension geared to current salaries. Although detrimental when measured by the literal words of the original fluctuation provision, the 1966 amendment had no effect upon its objective. As expressed in California decisional law throughout the retirement statute's existence, that objective had been the maintenance of the real purchasing power of the beneficiaries' allowances.

The 1966 restriction preserved the basic character of the earned benefit but withheld a windfall unrelated to its real character. In juxtaposition to the legitimate exercise of ongoing governmental powers, the beneficiaries' rights were measured not by "rigid literal fulfillment" of the contract, but by its "just and reasonable purport." (*Home Building & Loan Assn.* v. *Blaisdell, supra,* 290 U.S. at p. 429 [78 L.Ed. at pp. 423-424].) The law-making power chose to confine beneficiaries to the gains "reasonably to be expected from the contract" and to withhold "unforeseen advantages" which had no relation to the real theory and objective of the fluctuation provision. Such a choice is not the repudiation of a debt, not an impairment of the contract. (*City of El Paso* v. *Simmons,* 379 U.S. at p. 515 [13 L.Ed.2d at p. 458, 85 S.Ct. 577].)

Petitioner argues that denial of the retirement allowance calculated upon the new $16,000 salary denies equal protection of the laws. There is no constitutional requirement of uniform treatment, but only that there be a reasonable basis for each classification. (*Bilyeu* v. *State Employees' Retirement System,* 58 Cal.2d 618, 623 [24 Cal.Rptr. 562, 375 P.2d 442].) The distinction between pre-1967 legislators and those serving thereafter was not arbitrary, for the former had paid contributions based upon the relatively low salary levels preceding 1967, while the latter would pay contributions based upon the new $16,000 salary.

The petition for writ of mandate is denied and the order to show cause discharged.

Janes, J., and Bray, J.,* concurred.

Petitioner's application for a hearing by the Supreme Court was denied June 11, 1969.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.