[L.A. No. 31702. July 11, 1983.]

DON A. ALLEN, SR., et al., Plaintiffs and Respondents, v.
BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES'
RETIREMENT SYSTEM, Defendant and Appellant.

**COUNSEL**

Gerald R. Adams, Charles I. Gibbs, Donald M. Pach and Bullen, McKone, McKinley, Gay, Keitges & Pach for Defendant and Appellant.

Stroock & Stroock & Lavan, William H. Levit, Henry J. Silberberg and Margaret A. Nagle for Plaintiffs and Respondents.

William M. Bennett as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

RICHARDSON, J.—The Board of Administration of the Public Employees' Retirement System (the Board) appeals from a judgment of the Los Angeles County Superior Court declaring that the restrictions of article IV, section 4 of the California Constitution and section 9359.11 of the Government Code (all further statutory references are to this code) may not constitutionally be applied in computing the retirement allowances of respondents, who are former state legislators or their surviving spouses. By its peremptory writ of mandate, the trial court ordered the Board to recalculate those retirement benefits in accordance with sections 9359.1, subdivision (a), and 9360.9, without giving effect to article IV, section 4, and section 9359.11. (The relevant portions of these enactments are set forth in an appendix to this opinion.) For reasons hereinafter developed, we conclude that the trial court erred, and accordingly reverse its judgment and vacate the writ.

Respondents are 32 retired former legislators or their surviving spouses. Each of the legislators served in the Legislature during the 1963-1965 terms and retired prior to the legislative term commencing January 1, 1967. Respondents are all current members of the Legislators' Retirement System (LRS). The Board is the statutory administrator of the LRS. (See §§ 9350.2, 9353.)

At least since 1949, the Legislators' Retirement Law (LRL) (§ 9350 et seq.) has provided that the basic retirement benefit of a legislator is an annual sum equal to 5 percent of the compensation payable to incumbent legislators at the time the retirement allowance falls due, multiplied by the number of years served by the legislator, not exceeding 15. (See § 9359.1, subd. (a).) In so defining such allowances, the LRL thus contemplated retirement benefits which would vary with current legislative salaries, presumably in order that retirees, like current legislators, could maintain a fairly constant standard of living despite fluctuations in living costs. Implicit in this scheme was the assumption that legislators' salaries periodically would be adjusted to reflect current costs of living.

When the LRL was adopted, legislators were receiving a salary of $100 per month for what essentially was part time employment. (See Cal. Const., former art. IV, § 2, repealed in 1966.) By constitutional amendments that monthly salary was successively increased to $300 in 1949 and $500 in 1954. (Before 1966 legislative salaries were fixed by the Constitution and could not be modified by the Legislature. (See *id.*, § 23b, repealed in 1966.).)

In 1963, during respondents' incumbency, the Legislature adopted section 9360.9. That statute provided for the direct adjustment of retirement allowances to be paid retired legislators commencing in 1964 to reflect increases in the cost of living since 1954, with annual increases each year thereafter based upon any cost-of-living increase during the preceding year. By adoption of this new fluctuating factor in the computation of retirement allowances tied to cost of living rather than to current legislative salaries, the Legislature apparently sought to accomplish in a different way the LRL's objective of maintaining the purchasing power of retirement benefits. The original plan to achieve that objective—connecting retirement allowances to current legislative salaries—had proven ineffective because those salaries were not increased periodically to reflect inflated living costs from 1954 to 1964, when section 9360.9 became effective.

In 1966, as a result of an extensive partial revision of the California Constitution, annual regular legislative sessions were introduced and state legislators were authorized for the first time to set their own salaries. (See Cal. Const., art. IV, §§ 3, 4.) The former provision for a salary of $500 per month (see *id.*, former art. IV, § 2, subd. (b)) was repealed and a 1966 statute establishing a salary of $16,000 per annum commencing January 2, 1967, was ratified. (See *id.*, former art. XXII, § 6, as adopted Nov. 8, 1966; § 8901.) Included in article IV, section 4 was a provision prohibiting the Legislature from utilizing the new, substantially increased legislative salary as a basis for computing the retirement benefits of any legislator who retired before 1967 and therefore had not in fact received the new salary during his or her incumbency. The pensions of legislators whose salaries had not exceeded $500 per month were to continue to be computed on the basis of that salary. Contemporaneously, the Legislature added section 9359.11 to the LRL, operative January 2, 1967. That section expressly provides that notwithstanding any contrary provision of section 9359.1—tying retirement allowances to current legislators' salaries—the retirement benefit of any legislator retiring before 1967 shall be based upon the $500 monthly salary.

Pursuant to these provisions, the Board consistently has computed the retirement allowances of respondents on the basis of the $500 monthly salaries which they had received as legislators, adjusted for the cost-of-living increases provided by section 9360.9. In December 1978, however, apparently in response to our decision in *Betts* v. *Board of Administration* (1978) 21 Cal.3d 859 [148 Cal.Rptr. 158, 582 P.2d 614], respondents applied to the Board to recalculate their retirement allowances free of the restrictions imposed by section 9359.11, and article IV, section 4 of our Constitution. The Board rejected the application.

Respondents then sued for mandate to compel the Board to grant the relief requested on the ground that application of the foregoing constitutional and statutory limitations to the computation of their retirement benefits impaired their contractual pension rights in violation of the contract clauses of the United States and California Constitutions. (See U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) The Board, in cross-complaining for declaratory relief, urged the constitutionality of the challenged provisions and the validity of its computations pursuant thereto. As indicated, the trial court accepted respondents' contentions and issued mandate. The Board appeals.

█ The United States Constitution prohibits any state from passing a law "impairing the obligation of contracts." (U.S. Const., art. I, § 10.) A parallel proscription is contained in article I, section 9 of the California Constitution. The federal provision has been held to apply to any enactment upon which a state confers the force of law, including its own Constitution. (*Lyon* v. *Flournoy* (1969) 271 Cal.App.2d 774, 779 [76 Cal.Rptr. 869], and cases therein cited.) It follows, accordingly, that even though a state may by constitutional amendment supersede its own constitutional protection for contracts, such modification and any law adopted pursuant thereto still must pass federal constitutional muster. (See *Olson* v. *Cory* (1982) 134 Cal. App.3d 85, 101 [184 Cal.Rptr. 325].)

█ Not every change in a retirement law constitutes an impairment of the obligations of contracts, however. (See *Stork* v. *State of California* (1976) 62 Cal.App.3d 465, 468 [133 Cal.Rptr. 207].) Nor does every impairment run afoul of the contract clause. The United States Supreme Court has observed, "Although the Contract Clause appears literally to proscribe 'any' impairment, . . . 'the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.' [Citation.] Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution." (*United States Trust Co.* v. *New Jersey* (1977) 431 U.S. 1, 21 [52 L.Ed.2d 92, 109, 97 S.Ct. 1505].) An attempt must be made "to reconcile the strictures of the Contract Clause with the 'essential attributes of sovereign power,' . . ." (*Ibid.*) For example, "[m]inimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." (*Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 245 [57 L.Ed.2d 727, 737, 98 S.Ct. 2716], fn. omitted; accord *Valdes* v. *Cory* (1983) 139 Cal.App.3d 773, 789 [189 Cal.Rptr. 212].)

The high court also has expressed the relevant principles another way: "The constitutional prohibition against contract impairment does not exact

a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their 'just and reasonable purport'; not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. (*City of El Paso* v. *Simmons* (1965) 379 U.S. 497, 508 . . .; *Home Building & Loan Assn.* v. *Blaisdell* [1934] 290 U.S. [398,] 428-429, 434-435 . . . .) The contract clause and the principle of continuing governmental power are construed in harmony; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains 'reasonably to be expected from the contract.' (*City of El Paso* v. *Simmons, supra,* 379 U.S. at p. 515 . . . .) Constitutional decisions 'have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change.' (*Ibid*; see 70 Dick. L.Rev. 524-534 (1966); 56 Colum. L.Rev. 251-270 (1956).)" (*Lyon* v. *Flournoy, supra,* 271 Cal.App.2d at p. 782; accord *Coast Bank* v. *Holmes* (1971) 19 Cal.App.3d 581, 596 [97 Cal.Rptr. 30].)

The application of these principles to the modification of rights arising under the retirement laws of this state has been well established. ■ Thus, "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing entity. [Citation omitted.]" (*Betts* v. *Board of Administration, supra,* 21 Cal.3d 859, 863; see *Kern* v. *City of Long Beach* (1947) 29 Cal.2d 848, 853 [179 P.2d 799].)

A constitutional bar against the destruction of such vested contractual pension rights, however, does not absolutely prohibit their modification. With respect to active employees, we have held that any modification of vested pension rights must be reasonable, must bear a material relation to the theory and successful operation of a pension system, and, when resulting in disadvantage to employees, must be accompanied by comparable new advantages. (*Allen* v. *City of Long Beach* (1955) 45 Cal.2d 128, 131 [287 P.2d 765], and cases cited; *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 449 [326 P.2d 484]; *Lyon, supra,* 271 Cal.App.2d at p. 782.) As to retired employees, the scope of continuing governmental power may be more restricted, the retiree being entitled to the fulfillment without detrimental modification of the contract which he already has performed. (*Lyon, supra,* at p. 783.) "Nevertheless, even here, it is necessary to perceive the terms of the contract and to utilize those terms to measure the claimed impairment." (*Ibid.*)

■ The constitutional and statutory provisions which delineate the contract before us already have received careful appellate construction. In *Lyon,* the operative facts closely paralleled those in the present matter. Lyon was a legislator who had retired in 1955, at a time when a legislator's salary was constitutionally fixed at $500 per month. Like the retirement benefits of respondents here, therefore, Lyon's benefit theoretically would fluctuate with periodic adjustments in the salaries of incumbent legislators, in accordance with section 9359.1, subdivision (a). As already noted, however, the prospective advantage of that statute remained theoretical for all retired legislators during that period because salaries remained at the $500 per month level until 1967. Further, although Lyon had retired and, in fact, had died before the Legislature's adoption of the direct cost-of-living adjustment provision of section 9360.9 in 1963, his widow's retirement allowance nonetheless was increased in accordance with that cost-of-living formula, as were the retirement allowances of legislators like respondents who retired subsequently.

After the constitutional revision of 1966, Lyon's widow sued to have her retirement allowance—fixed at one-half of her husband's allowance—computed on the basis of the new, substantially increased salary of $16,000 per annum, notwithstanding the explicit constitutional prohibition against such procedure. As with respondents here, she claimed that the new provision's attempt to abrogate the fluctuating pension feature of section 9359.1, subdivision (a), with respect to legislators who had received no more than $500 per month impaired her vested pension rights in violation of her husband's contract. The *Lyon* court rejected her claim.

In analyzing the statutes comprising the terms of the contract upon which the claimant relied, the *Lyon* court first observed that the mathematical relationship described in section 9359.1, subdivision (a), between retirement benefits and current legislative salaries was designed to enable "retired employees to maintain a fairly constant standard of living despite fluctuations in living costs." (271 Cal.App.2d at p. 783.) The court then noted the patent failure of the means originally chosen to achieve that objective because of the neglect of the people, by constitutional amendment, to adjust legislative salaries over a 12-year period, contrary to the implicit assumption on which the mathematical formula had been based. (*Id.,* at pp. 783-785.) In the face of the people's rejection of several proposed constitutional amendments designed to increase those salaries—and, as a consequence, the pensions tied thereto—the Legislature then undertook to extend relief to retirees in a manner which *was* within its power, adding to the LRL the cost-of-living adjustment formula of section 9360.9.

Thus, the Legislature accomplished directly what it no longer realistically could expect to occur as an incident of the original statutory scheme. "In

the perspective of 1963 the original fluctuation formula [of section 9359.1, subdivision (a)] was now dormant, for there was no prospect that the voters would raise the salaries of active legislators." (*Id.*, at p. 785.)

"Against this background, the 1966 constitutional revision, with its rejection of the proposed $16,000 salary as a factor in the retirement allowance of existing beneficiaries, was framed and adopted. The original law had held out to the covered employees a fluctuation provision whose theory and objective, whatever its literal means, was to sustain the living standard of the system's beneficiaries. This objective was now being met with a substitute formula, which tied the benefit amount to cost indices rather than current salaries. The sharp salary increase to $16,000 was not tied to the creeping progression of cost indices. Neither had it any relevancy to the retirement law's cost-of-living objective. That objective was being met by the substitute formula, and the 1966 restriction in no way obstructed it." (*Lyon, supra,* 271 Cal.App.2d at p. 785.)

Acknowledging that the 1966 exclusion prevented *literal* fulfillment of the 1947 law's provision for a pension geared to current salaries and was thus theoretically "detrimental" when measured solely by the *language* of the original fluctuation provision, the *Lyon* court emphasized that the constitutional revision had no such actual effect upon either the objective or operation of the retirement law. "As expressed in California decisional law throughout the retirement statute's existence, that objective had been the maintenance of the real purchasing power of the beneficiaries' allowances." (271 Cal.App.2d at p. 787.)

In thus rejecting the claim that Mrs. Lyon's vested contractual rights had been impaired unconstitutionally, the *Lyon* court explained: "The 1966 restriction preserved the basic character of the earned benefit but withheld a windfall unrelated to its real character. In juxtaposition to the legitimate exercise of ongoing governmental powers, the beneficiaries' rights were measured not by 'rigid literal fulfillment' of the contract, but by its 'just and reasonable purport.' (*Home Building & Loan Assn.* v. *Blaisdell, supra,* 290 U.S. at p. 429 . . . .) The law-making power chose to confine beneficiaries to the gains 'reasonably to be expected from the contract' and to withhold 'unforeseen advantages' which had no relation to the real theory and objective of the fluctuation provision. Such a choice is not the repudiation of a debt, not an impairment of the contract. (*City of El Paso* v. *Simmons,* 379 U.S. at p. 515 . . . .)" (271 Cal.App.2d at p. 787.) We agree.

Respondents contend, however, that the foregoing rationale of *Lyon* has been weakened by our subsequent decision in *Betts* v. *Board of Administration, supra,* 21 Cal.3d 859. *Betts* involved an LRS member who served as

State Treasurer from 1959 to 1967. During that period a retired Treasurer's allowance was computed on the basis of the incumbent Treasurer's salary. (See former § 9359.1, subd. (b).) In 1963, while Betts was still in office, the cost-of-living adjustment formula of section 9360.9—by its terms also applicable to constitutional officers—was added to the LRL. In 1969, after he left government service but before he formally retired, the incumbent's salary was increased. In 1974, and still before Betts's retirement, section 9359.1, subdivision (b), was amended to eliminate the fluctuating basis of a retired executive officer's retirement allowance and to substitute therefor the highest salary that officer actually had received during his own incumbency. Thereafter, Betts retired.

In upholding Betts' subsequent claim that the 1974 amendment could not constitutionally be applied to eliminate the fluctuating feature of his pension, we concluded that under the circumstances of that case "the prior version of section 9359.1 together with section 9360.9, enacted in 1963, form the basis by which petitioner's reasonable pension expectations must be measured." (21 Cal.3d at p. 867.) We rejected the Board's claim in *Betts* that the 1963 addition to the LRL of the cost-of-living adjustment factor of section 9360.9 should be viewed as a "comparable new advantage" to offset the 1974 attempted elimination of the fluctuating factor embodied in former section 9359.1, subdivision (b), reasoning that Betts had served as Treasurer for four years under a statutory scheme which apparently contemplated application of both the fluctuating and cost-of-living factors to his retirement allowance. (*Ibid.*)

The primary basis for our determination that Betts reasonably was entitled to expect the benefit of both the fluctuating and cost-of-living provisions was the absence in his case of any factors militating against the reasonableness of that expectation such as were present in *Lyon* and are present here. There was no suggestion in *Betts,* for example, that the statutory scheme for pension enhancement of constitutional officers, like Betts, was not operating as originally designed. *Lyon* and the present case, on the other hand, are premised upon the discrepancy between the theoretical objective and the actual operation of the legislators' statutory pension scheme.

Thus, respondents' argument that they, like Betts, served while both the fluctuating provision of section 9359.1, subdivision (a), and the cost-of-living provision of section 9360.9 were "in effect," misses the point. Such a claim misapprehends the true character of the LRL as it actually operated on legislators' retirement benefits during respondents' incumbency. Indeed, in *Betts* we stressed the "historically unique" context in which the *legislative* salary/retirement scheme operated during the period here in question and which gave rise to the constitutional revision of 1966. (21 Cal.3d at

pp. 865-866.) Distinguishing *Lyon,* we noted that because of those unique circumstances, the retiree there, unlike Betts, "had no 'reasonable expectation' while in office that he would enjoy a *double* cost-of-living formula . . . ." (*Id.,* at p. 866, italics in original.)

In focusing on "*reasonable* pension expectations" in *Betts* (italics added), we implicitly affirmed the well established constitutional principle that "Laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract." (*El Paso* v. *Simmons* (1965) 379 U.S. 497, 515 [13 L.Ed.2d 446, 458, 85 S.Ct. 577].) "The Constitution is 'intended to preserve practical and substantial rights, not to maintain theories.' *Davis* v. *Mills* [1904] 194 U.S. 451, 457." (*Faitoute Co.* v. *Asbury Park* (1942) 316 U.S. 502, 514 [86 L.Ed. 1629, 1637, 62 S.Ct. 1129].) The claimed impairment of respondents' theoretical contractual right to the application of the fluctuating formula of section 9359.1, subdivision (a), to their pensions—a theory which directly conflicts with the actual operation of the LRS during their incumbency—thus derives no support from the contract clause.

Neither do we find persuasive respondents' attempt to distinguish their case from *Lyon* on the ground that Lyon had retired before the addition of the cost-of-living formula of section 9360.9 to the LRL while respondents retired after that enactment. Respondents argue that because the cost-of-living feature was added after Lyon's retirement, he had no reasonable expectation to the benefit of *that* formula. Therefore, they contend, its addition to the LRL in 1963 somehow compensated for the subsequent constitutional elimination of the fluctuating feature in 1966. They note that we referred to that circumstance in *Betts* (see 21 Cal.3d at p. 866), and urge that *Lyon* must be viewed as turning on that factor, which is lacking in the present case.

Here again, however, respondents seek to capitalize on the technical co-existence of the fluctuating and cost-of-living provisions during their incumbency, contrary to the actual operation of the LRS. *Betts,* on the other hand, focused on the *effect* of the contemporaneous statutory provisions on the employee's reasonable pension expectations in the actual circumstances of that case. As we have indicated, the mere existence of section 9359.1, subdivision (a), could not, in view of its practical dormancy, have added anything to respondents' reasonable pension expectations in the context of this case. The essential and critical factor is that neither respondents nor the claimant in *Lyon* reasonably could expect under the terms of their employment contract to obtain retirement allowances computed on the basis of the

unique salary increase accomplished by the constitutional revision of 1966 which expressly negated such expectations.

While not examined by the parties, a fiscal consideration provides additional support for rejection of respondents' claim. Respondents were required to contribute 4 percent of their $500 monthly salaries to the LRS. (See § 9357.) From its inception, the LRL contemplated periodic state contributions to the LRS from the general fund in such amounts as would equal the estimated difference between accumulated members' contributions and the retirement benefits actually paid each year. (See former § 9358, as adopted in 1947.) In 1977, the state's contribution was fixed by statute at 18.81 percent of the retirement benefits paid during each preceding month (§ 9358); presumably, previous experience had indicated that state contributions in that percentage of benefits paid approximates the difference between income to and outgo from the LRS.

It thus becomes apparent that payment to respondents of inflated retirement allowances, computed on the basis of a $16,000 annual salary which they never had received, not only would give to them a bonanza far outstripping any reasonable expectation for cost-of-living increases—as indicated above—but also would afford them pensions dwarfing their relatively modest contributions to the LRS. (See *Betts, supra,* 21 Cal.3d at p. 866.) This, in turn, would require correspondingly excessive appropriations of general tax funds to maintain the retirement system's fiscal integrity. In our interpretation of the interplay of sections 9359.1, 9359.11, and 9360.9, every principle of equity and financial responsibility strongly counsels against such a consequence.

CONCLUSION

By their constitutional revision of 1966, the people of California elected, in part, to redress inequitably low legislative salaries—reflecting the increased duties of annual legislative sessions—while at the same time confining retirement beneficiaries to those gains reasonably to be anticipated from their employment contract. With respect to legislators who retired before the salaries were increased so substantially, that restriction took the form of withholding unforeseen or windfall advantages which bore no relation to the fundamental theory and objective of the LRS, as protected by provision for cost-of-living adjustments. Such action by the people constituted neither the repudiation of any debt nor the unconstitutional impairment of an employment contract. For these reasons, we reverse the trial court's judgment and remand for further proceedings consistent with our opinion.

Bird, C. J., Kaus, J., Reynoso, J., Grodin, J., Stone, J.,* and Thompson, J.,* concurred.

Respondents' petition for a rehearing was denied September 7, 1983.

---

### APPENDIX

(Excerpt from California Constitution)
Article IV, Section 4)

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
"The Legislature may not provide retirement benefits based on any portion of a monthly salary in excess of 500 dollars paid to any member of the Legislature unless the member receives the greater amount while serving as a member in the Legislature. . . . ."

(Excerpts from Government Code)

### § 9359.1. Retirement allowance; amount

"(a) The retirement allowance for a member all of whose credited service was rendered as a Member of the Senate or Assembly except as provided in subdivision (d) is an annual amount equal to five percent (5%) of the compensation payable, at the time payments of the allowance fall due, to incumbent Members of the Senate or Assembly, multiplied by the number of years of service with which the member is entitled to be credited at the time of his retirement not to exceed fifteen (15) years. In no event shall any retirement allowance payable under this chapter to any such member exceed the compensation payable to Members of the Legislature at the time the payment of the allowance is made, except that the retirement allowance of any such member who serves more than 15 years shall be increased by an amount equal to 3 percent of the compensation payable, at the time payment of the allowance falls due, to incumbent Members of the Senate or Assembly for each year or fraction of a year in excess of 15 years.

"(b) The retirement allowance for a member all of whose credited service was rendered as an elective officer of the state whose office is provided for by the Constitution other than a judge (and other than a Member of the Senate or Assembly) the sum of (1) is an annual amount equal to five percent (5%) of the highest compensation received by the officer while serving in such office, multiplied by the number of years of service with which the member is entitled to be credited at the time of his retirement, not to exceed eight (8) years, plus, if the member is credited with 24 or more years of service, (2) one and two-thirds percent (1⅔%) of the compensation to which the five percent (5%) rate is applicable under subparagraph (1) of this subdivision for his first eight years of credited service, multiplied by the number of years of service in excess of eight years with which the member is entitled to be credited at the time of his retirement, not to exceed 12 years of such credited service in excess of the eight years of service referred to in subparagraph (1) of this subdivision.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

### § 9359.11. Service ending prior to term commencing in 1967; salary for application of formula

"Any contrary provisions of Section 9359.1 notwithstanding, in computing the retirement allowance of a legislator member of the Legislators' Retirement System whose service as a

---

*Assigned by the Chairperson of the Judicial Council.

legislator ended prior to the term commencing in 1967, the salary to which the applicable formula shall be applied shall be five hundred dollars ($500) per month, and any increase in salary of legislators above such amount shall be disregarded for such purpose."

§ 9360.9.  Cost of living adjustments

"Notwithstanding any other provisions of this chapter, the provisions of this section shall be applicable to all allowances granted by this chapter commencing with each installment paid or payable on or after January 1, 1964, with respect to Members of the Senate or the Assembly not having service in such office during or after the term commencing in 1967 and members who are elective officers of the state whose offices are provided by the Constitution and who were first elected to any such office prior to January 1, 1966.

"On or before January 1, 1964, the board shall adjust the amount of the allowances payable during the 1964 calendar year to reflect any increase in cost of living occurring between the 1963 calendar year and the 1955 calendar year, inclusive, and any increase resulting from such adjustment shall be payable commencing with each installment of allowances paid or payable on or after January 1, 1964. On or before January 15, 1965, and, on or before January 15 of each year thereafter, the amount of the allowances provided by this chapter shall be adjusted by the board to reflect any increase in cost of living occurring after January 1 of the immediately preceding calendar year. Effective January 1, 1978, the average of the separate indices of the 'Consumer Price Index for All Urban Customers' for the Los Angeles-Long Beach-Anaheim area and the San Francisco-Oakland area, as published by the United States Bureau of Labor Statistics, shall be used as the basis for determining the changes in the cost of living. For the period prior to January 1, 1978, the average of the separate indices for the Los Angeles-Long Beach area and the San Francisco-Oakland area, as published by the United States Bureau of Labor Statistics, shall be used as the basis for determining the changes in the cost of living. The cost-of-living increase shall equal or exceed 1 percent before any adjustment is made in the allowance. The calendar year 1954 shall be used as the base year in computing any annual adjustment. The annual adjustment made on or before January 15, 1965 and made on or before January 15 of each calendar year thereafter shall correspond to the average annual change in the calendar year immediately preceding the year during which the adjustment shall be effective. The adjustment made on or before January 1, 1964, shall correspond to the total of the average annual changes in each calendar year from the 1955 calendar year to the 1963 calendar year, inclusive.

"The adjustment provided by this section shall be made only if it operates to effect an increase over the allowance payable for the calendar year immediately preceding."